FILED

2018 Mar-13  AM 10:16
U.S. DISTRICT COURT
N.D. OF ALABAMA

## THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA

RAY CHARLES SCHULTZ, *et al.*,
     Plaintiffs,

v.

STATE OF ALABAMA, *et al.*,
     Defendants.

RANDALL PARRIS, *et al.*,
     Intervenor-Plaintiffs,

v.

JUDGE MARTHA WILLIAMS, *et al.*,
     Intervenor-Defendants.

BRADLEY HESTER,
     Intervenor-Plaintiff,

v.

MATT GENTRY, *et al.*,
     Intervenor-Defendants

Case No. 5:17-cv-00270-MHH

(Class Action)

**EXPEDITED HEARING
REQUESTED**

## MEMORANDUM IN SUPPORT OF
## PLAINTIFF-INTERVENOR HESTER'S
## <u>MOTION FOR PRELIMINARY INJUNCTION</u>

## <u>TABLE OF CONTENTS</u>

I.   INTRODUCTION ...............................................................................1

II.  FACTUAL BACKGROUND.............................................................3

    A.   Defendants' Money Bail Practices Detain People Based on Their
        Wealth Rather Than Their Suitability for Release...............................3

        1.   Defendants unconstitutionally detain people unable to pay
              money bail set pursuant to the bail schedule. ...........................3

        2.   Defendant Gentry detains arrestees who cannot pay the
              predetermined money bail amount while releasing those who
              can pay. .....................................................................................4

        3.   Defendants Black, White, Chaney, and Turner do not review
              the predetermined financial conditions of release for weeks
              or months....................................................................................5

    B.   Mr. Hester Cannot Afford the Amount Required by the Bail
        Schedule. ...........................................................................................8

III. ARGUMENT......................................................................................9

    A.   Plaintiff is Likely to Succeed on Both Claims That Defendants'
        Post-Arrest Procedures Violate the Equal Protection Clause and
        Substantive Due Process, As Well As Their Correlated Procedural
        Requirements. ....................................................................................9

        1.   Defendants' procedures violate equal protection because
              they fail to make findings about ability to pay prior to setting
              secured money bail....................................................................9

        2.   Defendants' procedures violate substantive due process
              because they detain arrestees without providing adequate
              procedural protections...............................................................15

    B.   Mr. Hester and the Putative Class Will Suffer Immediate and
        Irreparable Injury Unless a Preliminary Injunction Issues. ................25

    C.   The Threatened Injury to the Putative Class Outweighs Any
        Potential Harm a Preliminary Injunction Might Cause.......................26

    D.   An Injunction Would Serve the Public Interest. .................................29

    E.   The Court Should Not Require Plaintiff to Post a Security. ...............30

IV.  CONCLUSION................................................................................31

# I.   **INTRODUCTION**

This case implicates two overlapping but distinct constitutional rights: the right against wealth-based detention and the right to pretrial liberty.  Both implicate heightened scrutiny and require particular procedural protections to ensure that wealth-based detention is limited to those for whom there are no less restrictive alternatives to detention.  The first, the right against wealth-based detention, as articulated in *Bearden v. Georgia*, 461 U.S. 660 (1983), *Turner v. Rogers*, 564 U.S. 431 (2011), and their progeny, is the equal protection prohibition on jailing a person solely because she cannot pay a monetary sum.  To comply with equal protection, Defendants must make a procedurally proper inquiry into ability to pay, and they must consider alternatives to incarceration that will satisfy the State's interests in public safety and court attendance before setting an unaffordable monetary sum.  The second, the right to pretrial liberty, as articulated in *United States v. Salerno*, 481 U.S. 739 (1987), and its progeny, is a broader substantive due process prohibition than that against wealth-based detention, in that it prohibits the State from infringing a defendant's fundamental right to pretrial liberty under any circumstances unless adequate procedural protections are followed.

Defendants violate these constitutional rights every day in Cullman County. Plaintiff Bradley Dewayne Hester, and those similarly situated, are jailed solely

because they cannot afford to pay the amount required for release by the bail schedule.[1]  The only reason persons like Mr. Hester are incarcerated is because they cannot afford to purchase their freedom.  Defendants do not make any inquiry or findings concerning an arrestee's ability to pay the secured money bail amount or consider non-financial alternative conditions of release when they determine whether an arrestee should remain jailed following arrest.  Instead, access to money is the determinative factor as to whether a person remains in jail following arrest.  If a person can pay the secured money bail amount, she is released from jail immediately.  But those—like Mr. Hester—who are unable to pay are jailed solely because of their poverty.

In view of these factual circumstances, the Court should issue a preliminary injunction enjoining Sheriff Gentry from prospectively jailing arrestees unable to pay secured monetary bail without an individualized hearing with adequate procedural safeguards, including an inquiry into and findings concerning ability to pay, the suitability of alternative non-financial conditions of release, and a finding on the record—where counsel is made available and the arrestee is able to present evidence—by at least clear and convincing evidence that any conditions of release are the least restrictive conditions necessary to achieve public safety and court

---

[1] At the time Mr. Hester filed his motion to intervene (Doc. No. 76), he was detained pursuant to these procedures.  *See* Hester Decl. (Doc No. 77).  He has since been released, but mootness is inapposite because his claims are inherently transitory.  *See Edwards v. Cofield*, 265 F. Supp. 3d 1344, 1347 (M.D. Ala. 2017) (finding inherently transitory exception to mootness doctrine applicable in nearly identical challenge to Randolph County, Alabama, bail practices).

appearance.  As explained in greater detail below, the prerequisites for injunctive relief are satisfied here.  Simply put, the practice of jailing individuals unable to pay a monetary sum without inquiry into or findings concerning their ability to pay has no place in a legal system committed to equal justice.

## II.  FACTUAL BACKGROUND

### A.  Defendants' Money Bail Practices Detain People Based on Their Wealth Rather Than Their Suitability for Release.

Poverty is a substantial issue in Cullman County.  Nearly one out of every five people lives in poverty.[2]  Less than forty percent of the population over the age of sixteen worked full-time year-round in 2016, the last year for which data is available.[3]  Nearly fifty percent of the population did not work at all in 2016.[4]

#### 1.  Defendants unconstitutionally detain people unable to pay money bail set pursuant to the bail schedule.

The Sheriff requires any person arrested and charged with a misdemeanor or felony offense to pay a secured amount of money bail (i.e., cash, commercial surety, or property) to be released from jail following arrest.  The amount that an arrestee must pay is predetermined by a bail schedule based on the charge.[5]

The bail schedule specifies a monetary range based solely on the charge.  *Id.*

---

[2] U.S. Census Bureau, *Poverty Status in the Past 12 Months: 2012-2016 Am. Comm. Survey 5-Year Estimates*, *available at* https://goo.gl/RzH2P1, attached as Ex. GG to the Decl. of Micah West, filed herewith (hereinafter "West Decl.").
[3] *Id.*
[4] *Id.*
[5] *See* Cullman County Bail Schedule, attached as Ex. A to West Decl.; *see also* Cullman County Sheriff Office's Bond Procedures, attached as Ex. TT to West Decl.

It does not contemplate consideration of a person's financial resources or whether any alternative, non-financial conditions of release may mitigate any relevant risk. *Id.* Immediate access to money alone determines whether a person remains in jail following arrest. If a person can pay, the individual is released from jail immediately. If the person is unable to pay, she remains incarcerated.

## 2. Defendant Gentry detains arrestees who cannot pay the predetermined money bail amount while releasing those who can pay.

When a person is arrested in Cullman County, she is booked into the Cullman County Jail, which is operated by the Sheriff's Department. Sheriff David Gentry is responsible for the operation of the jail and the release and detention of arrestees. *See* Ala. Code § 14-6-1.

After booking, arrestees are informed by Sheriff's Department employees of their bail amount. The Sheriff determines the required amount of money by referring to the bail schedule. As Sheriff Gentry explained,

> When someone comes into the jail, we have a chart we go by to set the bonds. You can't go outside the scope of the range; you have to be within the bond range. We bring in 30 people a day; those 30 won't go see the judge that day. But we already know what the bond amount's going to be when they come in. When you come in on possession of a controlled substance, $5,000; trafficking, $1 million.[6]

Arrestees who do not have other restrictions on their eligibility for release can pay this amount, make a phone call to ask a friend or family member to pay

---

[6] W.C. Mann, *Bail Bonds, Part 2: The Law Enforcement Perspective*, The Cullman Tribune (Feb. 15, 2017), https://goo.gl/okgWP8, attached as Ex. B to West Decl.

this amount, or contact a bonding agent to assist in posting bail.  If an arrestee can come up with the money, the Sheriff's Department accepts it and releases her.[7]

A person with financial resources will be released almost immediately after posting bail.  By contrast, the Sheriff's Department will continue to detain a person who cannot afford to pay the pre-set secured bail amount.  Defendant Gentry maintains this policy and practice even though he receives no notice that there has been an inquiry into a person's ability to pay the amount set, findings that the person can afford to meet the financial conditions of release, and consideration of alternative non-financial conditions of release.

Defendant Gentry's policy and practice of detaining people who cannot meet the predetermined financial conditions of release results in systematic wealth-based detention in Cullman County.  Indeed, Defendant Gentry sees his role as using the money bail system "to keep criminals off the street"[8] and has promised to do "everything within that bond schedule to keep [people] in jail."[9]

### 3.   Defendants Black, White, Chaney, and Turner do not review the predetermined financial conditions of release for weeks or months.

Defendant District Court Judges Chaney and Turner are responsible for setting policies governing release conditions.   *See* Ala. Code § 15-13-103.

---

[7] *See* Sheriff's Bonding Procedures, attached as Ex. TT to West Decl.

[8] Benjamin Bullard, *Sheriff explains bond system as lawsuit looms*, The Cullman Times (July 16, 2017), https://goo.gl/wp12dv, attached as Ex. SS to West Decl.

[9] W.C. Mann, *Drug Trafficking Defendants Sue County Officials: Sheriff Responds*, The Cullman Tribune (June 29, 2017), https://goo.gl/gQXYPx, attached as Ex. D to West Decl.

Defendant Magistrates Black and White enforce these policies and conduct an initial appearance for any person who cannot afford the monetary amount required by the bail schedule.  The initial appearance is conducted electronically, with the arrestee remaining in jail and the Defendant Magistrates appearing via FaceTime on an iPad from the Cullman County District Court.[10]

Under Alabama law, a judge or magistrate is required to conduct the initial appearance within 72 hours following arrest.  Ala. R. Crim. P. 4.3(a)(1)(iii), (b)(2)(i).  The purposes of the initial appearance under state law are to (1) ascertain the defendant's true name and address, (2) inform the defendant of the charges against her, and (3) notify the defendant of the right to counsel.  Ala. R. Crim. P. 4.4.  A judicial officer is also required to determine a defendant's conditions of release.  *Id.*; Ala. R. Crim. P. 7.4(a) ("If a defendant has not been released from custody and is brought before a court for initial appearance, a determination of the conditions of release shall be made.").

However, it is Defendants Black's, White's, Chaney's, and Turner's (collectively "Judicial Defendants") general practice to not allow arrestees to make arguments about their ability to pay or their suitability for release at the initial appearance.  Pursuant to Judicial Defendants' policy and practice, arrestees are not permitted to challenge their financial conditions of release or to request non-

---

[10] Tr. of Oral Arg. at 15:18–16:11, *Lee v. Gentry*, No. CV-2017-900027 (Feb. 1, 2017) (Doc. 31-2); *see also* Sample Order on Initial Appearance, attached as Ex. RR to West Decl.

monetary conditions of release.  Indeed, in her ten years as a magistrate, Defendant Black cannot recall a time when she reviewed the bail amount at the initial appearance.[11]  Because of these practices, the initial court appearance provides no opportunity for a person to raise ability to pay, to conduct a hearing on alternative conditions of release, or to raise any constitutional issues with ongoing post-arrest detention.

If an arrestee cannot afford money bail, her financial conditions of release are generally not reviewed at all.  Indeed, an arrestee's financial conditions of release are *only* reviewed if a person files a motion for bond reduction, which is generally scheduled for a hearing no earlier than two weeks after a person's arrest and as long as two months later.  *See* Decl. of Sara Wood ("Wood Decl.") ¶¶ 2–5, filed herewith.

Thus, an individual who cannot afford the predetermined secured money bail amount usually will be detained for weeks or months without any opportunity to raise any issues concerning her ability to pay or her suitability for release under alternative conditions.  By contrast, an arrestee who can pay the monetary amount required by the bail schedule is released immediately from jail.

Defendants' reliance on predetermined secured money bail has resulted in unnecessary wealth-based detention that is devastating for the poorest people in

---

[11] Tr. of Oral Arg. at 20:10–15, *Lee v. Gentry*, No. CV-2017-900027 (Feb. 1, 2017) (Doc. 31-2).

Cullman County.  Those affected have not been convicted of a crime and are only in jail because they cannot afford to pay secured money bail.

**B.   Mr. Hester Cannot Afford the Amount Required by the Bail Schedule.**

Mr. Hester is a 35-year-old man who lives in Cullman, Alabama.  Decl. of Bradley Hester ("Hester Decl.") ¶ 1 (Doc. 77).  On July 27, 2017, Mr. Hester was arrested for possession of drug paraphernalia, a misdemeanor.  *Id.* at ¶ 2; *see also* Complaint, attached as Ex. UU to West Decl.  He was taken to the Cullman County Jail and told that he had to pay a $1,000 bond required by the bail schedule or he would remain in jail.   Hester Decl. ¶ 3; *see also* Cullman County Bail Schedule, attached as Ex. A to West Decl.

A day or two after his arrest, Mr. Hester had his initial appearance via FaceTime on an iPad in the jail.  *See* Hester Decl. ¶ 6.  He was unrepresented by counsel at the hearing, which lasted for one to two minutes in total.  *Id.*  The magistrate informed Mr. Hester of the charge against him and his bond amount. *Id.*  The magistrate did not ask him any questions at all, tell him when his next court appearance would be, inquire into his ability to pay bail, or give him any opportunity to say that he could not pay it.  *Id.*  Although the magistrate told him that he could apply for an attorney, a correctional officer told him that he did not need one because he was only charged with a misdemeanor.  *Id.*

At the time of his arrest, Mr. Hester was indigent and could not afford to buy

his release from jail. *Id.* ¶¶ 4, 7. He had no assets, no bank account, no real property, and had been working odd jobs to support himself. *Id.* ¶ 4. He had an open wound from a spider bite on his hand that was painful and bleeding, which was not bandaged because he could not afford to pay for medical treatment. *Id.* ¶ 5. He slept on the floor of his cell because there were three people in the cell and only two beds. *Id.* ¶ 7.

## III. ARGUMENT

A preliminary injunction is warranted if the movant demonstrates: (1) a substantial likelihood of success on the merits; (2) irreparable harm in the absence of an injunction; (3) that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) that an injunction would not disserve the public interest. *Bryan v. Hall Chemical Co.*, 993 F.2d 831, 835 (11th Cir. 1993).

**A. Plaintiff Is Likely to Succeed on Both Claims That Defendants' Post-Arrest Procedures Violate the Equal Protection Clause and Substantive Due Process, As Well As Their Correlated Procedural Requirements.**

**1. Defendants' procedures violate equal protection because they fail to make findings about ability to pay prior to setting secured money bail.**

A person may not be "subjected to imprisonment solely because of his indigency." *Tate v. Short*, 401 U.S. 395, 398 (1971). The Court has consistently enforced this bedrock principle. *See, e.g.*, *id.*; *Williams v. Illinois*, 399 U.S. 235 (1970); *Bearden v. Georgia*, 461 U.S. 660 (1983); *Douglas v. California*, 372 U.S.

353, 355 (1963) (condemning the "evil" of "discrimination against the indigent");

*Griffin v. Illinois*, 351 U.S. 12, 19 (1956) ("There can be no equal justice where the

kind of trial a man gets depends on the amount of money he has.").

The rights at stake are especially significant for pretrial arrestees, who are

presumed innocent and whose liberty interests have not been diminished by a

criminal conviction.  Justice Douglas framed this case's basic inquiry as follows:

> To continue to demand a substantial bond which the defendant is
> unable to secure raises considerable problems for the equal
> administration of the law. . . .  Can an indigent be denied freedom,
> where a wealthy man would not, because he does not happen to have
> enough property to pledge for his freedom?

*Bandy v. United States*, 81 S. Ct. 197, 197–98 (1960) (Douglas, J., in chambers).

The Fifth Circuit answered Justice Douglas's question in the negative in

*Pugh v. Rainwater*, when it held that "[t]he incarceration of those who cannot

[afford to pay secured money bail], without meaningful consideration of other

possible alternatives, infringes on both due process and equal protection

requirements."  572 F.2d 1053, 1057 (5th Cir. 1978) (en banc).[12]  The Fifth Circuit

held that the Fourteenth Amendment requires courts to engage in "meaningful

consideration of . . . alternatives" to "incarceration" if a person cannot pay secured

bail, particularly because pretrial detention involves a "deprivation of liberty of

---

[12] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh
Circuit adopted as binding precedent all Fifth Circuit cases submitted or decided prior to October
1, 1981.

one who is accused but not convicted." *Id.* at 1057.

Over the last two years, federal district courts in Alabama, Mississippi, Louisiana, Missouri, Tennessee, Kansas, Georgia, and Texas have reached the same conclusion.[13]  Indeed, Alabama federal district courts have thrice held that post-arrest procedures nearly identical to the procedures at issue here violate the Fourteenth Amendment.  *See Edwards v. Cofield*, No. 3:17-CV-321, 2017 WL 2255775 (M.D. Ala. May 18, 2017); *Jones v. City of Clanton*, No. 2:15CV34, 2015 WL 5387219 (M.D. Ala. Sept. 14, 2015); *Cooper v. City of Dothan*, No. 1:15-cv-425, 2015 WL 10013003 (M.D. Ala. June 18, 2015).

Most recently, the Fifth Circuit affirmed that bail procedures in Harris County, Texas, violate the Fourteenth Amendment, because "poor arrestees in Harris County are incarcerated where similarly situated wealthy arrestees are not, solely because the indigent cannot afford to pay a secured bond."  *ODonnell v. Harris Cty., Texas*, 882 F.3d 528, 544 (5th Cir. 2018).  The court held that "heightened scrutiny is required when criminal laws detain poor defendants

---

[13] *See ODonnell v. Harris Cty., Texas*, 251 F. Supp. 3d 1052 (S.D. Tex. Apr. 28, 2017), *aff'd as modified*, 882 F.3d 528 (5th Cir. 2018); *Walker v. City of Calhoun*, No. 4:15-CV-0170, 2017 WL 2794064, at *3 (N.D. Ga. June 16, 2017), *appeal filed*, No. 17-13139 (11th Cir. July 13, 2017); *Rodriguez v. Providence Cmty. Corr.*, 155 F. Supp. 3d 758, 768–69 (M.D. Tenn. Dec. 17, 2015); *Thompson v. Moss Point*, No. 1:15CV182LG, 2015 WL 10322003, at *1 (S.D. Miss. Nov. 6, 2015); *Martinez v. City of Dodge City*, No. 15-CV-9344 (D. Kan. Apr. 26, 2016), attached as Ex. E to West Decl.; *Snow v. Lambert*, No. CV 15-567, 2015 WL 5071981 (M.D. La. Aug. 27, 2015); *Pierce v. City of Velda City*, 4:15-cv-570, 2015 WL 10013006 (E.D. Mo. June 3, 2015).

*because of* their indigence." *Id.*[14]   It ruled that wealth-based detention is "'invidious discrimination and not constitutionally permissible'" regardless of whether the context is post-conviction detention or pretrial detention. *Id.* at 544 n.6.   And the Fifth Circuit explained that it is a "basic injustice" when the wealthy are released and the poor detained solely due to their (in)ability to pay secured money bail. *Id.*

The aforementioned decisions rely on *Bearden* and its precursors, which prohibit jailing without finding that the person "willfully refused to pay . . . when he has the means to pay" and, if he cannot pay, "considering whether adequate alternative[s]" to jail "are available." 461 U.S. at 668–69.   Due process requires assessing one's ability to pay secured bail: without that inquiry, it is impossible "to guard against improper detention based only on financial resources." *In re Kenneth Humphrey*, 228 Cal. Rptr. 3d 513, 535 (Cal. Ct. App. 2018).

Moreover, an ability to pay inquiry must be procedurally proper "to assure accurate decisionmaking in respect to the key 'ability to pay' question." *Turner v. Rogers*, 564 U.S. 431, 445 (2011).   At a minimum, this requires (1) notice that ability to pay is a critical issue; (2) the use of a form or the equivalent to elicit

---

[14] *See also Bearden*, 461 U.S. at 666 (wealth-based detention requires a "careful inquiry"); *ODonnell v. Harris Cty., Tex.*, 227 F. Supp. 3d 706, 729–30 (S.D. Tex. 2016) (noting post-conviction detention review is "demanding" and closely approximates the heightened level of scrutiny required in the pretrial context, where "individuals remain clothed with a presumption of innocence and with their constitutional guarantees intact" (quoting *Pugh*, 572 F.2d at 1056)), *aff'd in part, rev'd in part on other grounds*, 882 F.3d 528 (5th Cir. 2018).

financial information; (3) an opportunity at a hearing for the defendant to respond to statements and questions about his or her financial status; and (4) an express finding by the court that the defendant has the ability to pay.  *Id.* at 447-48; *see also In re Humphrey*, 228 Cal. Rptr. 3d at 533–35 (applying *Turner* to pretrial context).

Here, Defendants are violating the Fourteenth Amendment because they jail anyone who cannot pay the amount the bail schedule requires without <u>any</u> inquiry—let alone a procedurally proper inquiry—into ability to pay.  *See Turner*, 564 U.S. at 447–48.  Defendants also violate the Fourteenth Amendment because there is no consideration of alternative conditions of release or a determination that those alternatives are inadequate.  *See Bearden*, 461 U.S. at 672 ("Only if the sentencing court determines that alternatives to imprisonment are not adequate in a particular situation to meet the State's interest . . . may the State imprison a [defendant] . . . . To do otherwise would deprive the [defendant] of his conditional freedom simply because, through no fault of his own, he cannot pay. . . .").

Any period of wealth-based detention must meet heightened scrutiny.  A system based entirely on blunt ability to pay cannot survive heightened scrutiny because it is not narrowly tailored to achieve the State's interest in public safety and court attendance.  Indeed, as the Fifth Circuit affirmed, "reams of empirical data" establishes that secured money bail is unnecessary to achieve court

attendance or public safety.  *ODonnell*, 882 F.3d at 537.[15]  Moreover, there is no

evidence that requiring more money increases appearance rates or public safety.[16]

Rather, empirical evidence suggests that unsecured bail is as effective or more

effective at achieving appearance and public safety for arrestees as secured money

bail.[17]  Experience from other jurisdictions further suggests that non-financial

conditions of release result in high rates of court appearance and low rates of new

criminal activity, and that simple alternatives and proper supervision are more

effective than secured money bail, even for those who can afford to purchase their

release from jail.[18]  Additionally, research shows that secured money bail does not

---

[15] *See also* Timothy R. Schnacke, Dep't of Just., Nat'l. Inst. of Corrs., *Fundamentals of Bail* 12 (Sept. 2014), https://goo.gl/jr7sMg, attached as Ex. H to West Decl. ("[E]ver since 1968, when the American Bar Association openly questioned the basic premise that money serves as a motivator for court appearance, no valid study has been conducted to refute that uncertainty. Instead, the best research to date suggests what criminal justice leaders have long suspected: secured money does not matter when it comes to either public safety or court appearance, but it is directly related to pretrial detention.").

[16] *See id.* at 11 ("[T]he financial condition of a bail bond is typically arbitrary; even when judges are capable of expressing reasons for a particular amount, there is often no rational explanation for why a second amount, either lower or higher, might not arguably serve the same purpose.").

[17] *See, e.g.*, Michael R. Jones, Pretrial Justice Institute, *Unsecured Bonds: The As Effective and Most Efficient Pretrial Release Option* 10 (Oct. 2013), https://goo.gl/UENBKJ, attached as Ex. I to West Decl. ("Whether released defendants are higher or lower risk or in-between, unsecured bonds offer the same public safety benefits as do secured bonds."); *see id.* at 11 (same conclusion, regarding court appearance); Arpit Gupta et al., *The Heavy Costs of High Bail: Evidence from Judge Randomization* 15, 22 (Aug. 18, 2016), https://goo.gl/OW5OzL, attached as Ex. K to West Decl. (finding use of money bail increases the likelihood of conviction by 12 percent).

[18] Mark Heyerly, *Pretrial Reform in Kentucky* 16 (Jan. 2013), attached as Ex. J to West Decl. (finding a decrease in the percentage of Kentucky defendants re-arrested following pretrial release, even as the percentage of those released on non-financial conditions increased); *see also* Pretrial Services Agency for the District of Columbia, *Outcomes for Last Four Years*, https://www.psa.gov/?q=node/558, attached as Ex. V to West Decl.; Pretrial Just. Inst., *The D.C. Pretrial Services Agency: Lessons from Five Decades of Innovation and Growth*, 2 Case Studies

ensure public safety, because release decisions are based on wealth rather than actual risk, and because a person detained for even a few days before release is *more* likely to commit new crimes than if released immediately.[19]

Thus, if Defendants are willing to offer secured money bail to facilitate prompt release, it is unconstitutional for them not to also offer equally prompt release on unsecured nonfinancial conditions of release to those who cannot pay.

## 2. Defendants' procedures violate substantive due process because they detain arrestees without providing adequate procedural protections.

Plaintiff is likely to succeed on his second claim for relief because

---

1 at 2 (2009), https://goo.gl/6wgPM8, attached as Ex. W to West Decl. ("The high non-financial release rate has been accomplished without sacrificing the safety of the public or the appearance of defendants in court.  Agency data shows that 88% of released defendants make all court appearances, and 88% complete the pretrial release period without any new arrests."); Thomas H. Cohen, U.S. Dep't of Just. Bureau of Just. Statistics, *Pretrial Release and Misconduct in Federal District Courts, 2008-2010* 13 (Nov. 2012), https://www.bjs.gov/content/pub/pdf/prmfdc0810.pdf, attached as Ex. X to West Decl. (finding from 2008 to 2010, only 1% of federal defendants released pretrial failed to make court appearances and 4% were arrested for new offenses).

[19] *See ODonnell*, 251 F. Supp. 3d at 1120 ("According to the most recent and credible evidence, secured financial conditions of pretrial release do not outperform alternative nonfinancial or unsecured conditions of pretrial release"); *see also* Int'l Ass'n of Chiefs of Police, *Resolution: Pretrial Release and Detention Process* 15–16 (Oct. 21, 2014), https://goo.gl/a5JUpe, attached as Ex. AA to West Decl. ("[D]efendants rated low risk and detained pretrial for longer than one day before their pretrial release are more likely to commit a new crime once they are released, demonstrating that length of time until pretrial release has a direct impact on public safety[.]"); Christopher T. Lowenkamp et al., Laura and John Arnold Foundation, *The Hidden Costs of Pretrial Detention* 3 (2013), https://goo.gl/CppsWy, attached as Ex. L to West Decl. (studying 153,407 defendants and finding that "when held 2–3 days, low risk defendants are almost 40 percent more likely to commit new crimes before trial than equivalent defendants held no more than 24 hours"); Paul Heaton et al., *The Downstream Consequences of Misdemeanor Pretrial Detention*, 69 Stan. L. Rev. 711, 768 (2017), https://goo.gl/Waj3ty, attached as Ex. M to West Decl. ("While pretrial detention clearly exerts a protective effect in the short run, for misdemeanor defendants it may ultimately serve to compromise public safety."); *id.* (finding that in a representative group of 10,000 misdemeanor offenders, pretrial detention would cause an additional 600 misdemeanors and 400 felonies than if the same group had been released pretrial).

Defendants fail to satisfy the substantive and procedural requirements that apply when the government detains a pretrial arrestee.

In *United States v. Salerno*, 481 U.S. 739 (1987), the Court analyzed the constitutionality of the Bail Reform Act under substantive and procedural due process. Substantively, the Court recognized a "fundamental" right to pretrial liberty. *Id.* at 750. Because pretrial freedom "is a vital liberty interest," *United States v. Montalvo-Murillo*, 495 U.S. 711, 716 (1990), the Court found that it is a "'general rule' of substantive due process that the government may not detain a person prior to a judgment of guilt in a criminal trial." *Salerno*, 481 U.S. at 749. Thus, the Bail Reform Act did not violate substantive due process only because it was "narrowly focuse[d]" to serve "compelling" interests. *Salerno*, 481 U.S. at 750. "If there was any doubt" about whether the Court required that pretrial detention must be narrowly tailored, "it has been resolved in subsequent Supreme Court decisions, which have confirmed that *Salerno* involved a fundamental liberty interest and applied heightened scrutiny." *Lopez-Valenzuela v. Arpaio*, 770 F.3d 772, 780 (9th Cir. 2014) (collecting cases).

Procedurally, *Salerno* held that the State must provide "exacting" procedural protections before a person may be detained pretrial. 481 U.S. at 752. The Court noted that the Bail Reform Act "operates only on individuals who have been arrested for a specific category of extremely serious offenses," and that the

- 16 -

government must make a probable cause showing "that the charged crime has been committed by the arrestee, *but that is not enough*." *Id.* at 750 (emphasis added). "In a full-blown adversary hearing, the Government must convince a neutral decisionmaker by clear and convincing evidence that no conditions of release can reasonably assure the safety of the community or any person." *Id.* (internal citation omitted). The Court distinguished the Bail Reform Act from "a scattershot attempt to incapacitate those who are merely suspected of these serious crimes." *Id.*

The substantive and procedural rights that *Salerno* recognized are interrelated. A court cannot determine if the deprivation of a person's substantive right to pretrial liberty is infringed unless rigorous procedures are provided to ensure that there are no less restrictive alternatives to pretrial detention that would ensure the State's interests in public safety and court attendance. *See Zadvydas v. Davis*, 533 U.S. 678, 690–91 (2001) ("[W]e have upheld preventive detention based on dangerousness only when limited to specially dangerous individuals and subject to strong procedural protections."); *Turner*, 564 U.S. at 445 (discussing the importance of robust procedural protections to ensure "accurate decisionmaking" before a person is jailed); *Brangan v. Commonwealth*, 80 N.E.3d 949, 964–65 (Mass. 2017) (when imposition of financial conditions of release will likely result in an arrestee's pretrial detention, the judge must provide "findings of fact and a statement of reasons for the bail decision," including consideration of the arrestee's

financial resources, "explain how the bail amount was calculated," and state why "the defendant's risk of flight is so great that no alternative, less restrictive financial or nonfinancial conditions will suffice to assure his or her presence at future court proceedings").

In a recent amicus brief, the Conference of Chief Justices, whose membership consists of the highest judicial officer of every American state and territory, reiterated that indigent arrestees are entitled to *Salerno*'s substantive findings and procedural safeguards prior to de facto detention based on a financial condition that they cannot afford. *See* Brief of Conference of Chief Justices as *Amicus Curiae*, *ODonnell v. Harris County, Tx.*, No. 17-20333, 2017 WL 3536467 at *27 (5th Cir. Aug. 9, 2017) ("*Salerno* upholds procedural safeguards for defendants 'arrested for a specific category of extremely serious offenses,' that 'Congress specifically found . . . more likely to be responsible for dangerous acts in the community after arrest.' An indigent defendant deprived of pretrial liberty is no less entitled to the safeguards of due process.").

Here, Plaintiff's liberty interests have been infringed. An order setting unaffordable conditions of release is "tantamount to setting no conditions at all." *United States v. Leathers*, 412 F.2d 169, 171 (D.C. Cir. 1969); *see also United States v. Mantecon-Zayas*, 949 F.2d 548, 550 (1st Cir. 1991) ("[O]nce a court finds itself in this situation—insisting on terms in a 'release' order that will cause the

defendant to be detained pending trial—it must satisfy the procedural requirements for a valid *detention* order . . . ." (emphasis original)); *Brangan*, 80 N.E.3d at 963 ("[W]here a judge sets bail in an amount so far beyond a defendant's ability to pay that it is likely to result in long-term pretrial detention,[20] it is the functional equivalent of an order for pretrial detention, and the judge's decision must be evaluated in light of the same due process requirements applicable to such a deprivation of liberty."); *State v. Brown*, 338 P.3d 1276, 1292 (N.M. 2014) ("Intentionally setting bail so high as to be unattainable is simply a less honest method of unlawfully denying bail altogether."); *In re Humphrey*, 228 Cal. Rptr. 3d at 532 (finding "safeguards" discussed in *Salerno* "are relevant to our consideration of the inquiries and findings necessary before a presumptively innocent arrestee may be detained prior to trial" on unaffordable money bail). Thus, Defendants' procedures must satisfy substantive and procedural due process before arrestees can be detained.

Here, Defendants' post-arrest procedures violate <u>substantive due process</u> because pretrial detention is not limited to arrestees for whom there are no less restrictive conditions of release. Defendants' post-arrest procedures are no more narrowly tailored than the "scattershot attempt to incapacitate" condemned by *Salerno*. 481 U.S. at 750. Indeed, courts have repeatedly found that there is no

---

[20] *Brangan* defined "long term" pretrial detention simply to mean "detention for a period of time longer than the defendant might need to collect cash or collateral to post bail." *Id.* at n.4.

relationship between ability to pay and public safety or appearance. *See In re Humphrey*, 228 Cal. Rptr. 3d at 540 (noting that bail schedules "have been criticized as . . . enabling the detention of poor defendants and release of wealthier ones who may pose greater risks"); *see also Bearden*, 461 U.S. at 671 (discrediting the "naked assertion that a [defendant]'s poverty by itself indicates he may commit crimes in the future and thus that society needs for him to be incapacitated."); *State v. Blake*, 642 So. 2d 959, 968 (Ala. 1994) (finding procedures authorizing wealth-based discrimination was "not a reflection of the State's interest in public safety"). Defendants' procedures, in other words, are not narrowly tailored to further the State's interests. *See ODonnell*, 251 F. Supp. 3d at 1156.

Defendants' post-arrest procedures also violate procedural due process because their reliance on a schedule is inadequate to ensure that detention is limited to those for whom there are no less restrictive alternatives.

*First*, Defendants do not provide prompt individualized release determinations that are guided by standards designed to limit pretrial detention to those for whom no less restrictive conditions of release exist. *See Stack v. Boyle*, 342 U.S. 1, 5 (1951) ("[T]he fixing of bail for any individual defendant must be based upon standards relevant to the purpose of assuring the presence of that defendant."). Instead, Defendants mechanically apply a bail schedule and detain anyone who cannot pay regardless of their individual circumstances. This practice

violates procedural due process because it fails to consider the "characteristics of an individual defendant that bear on the risk he or she currently presents." *In re Humphrey*, 228 Cal. Rptr. 3d at 539. "These schedules, therefore, represent the antithesis of the individualized inquiry required before a court can order pretrial detention." *Id.* at 539–40; *see also ODonnell*, 882 F.3d at 546 ("The fundamental source of constitutional deficiency in the due process and equal protection analyses is the same: the County's mechanical application of the secured bail schedule without regard for the individual arrestee's personal circumstances.").

*Second*, Defendants do not provide notice, a hearing, or an opportunity to be heard before detaining an arrestee: conditions of release are generally not reviewed until counsel files a motion for a bond reduction, which is often not heard for weeks after arrest. *See* Wood Decl. ¶¶ 2–5. But, "[t]he fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (citation omitted). At a minimum, "the federal due process right entitles detainees to a hearing within 48 hours," *ODonnell*, 882 F.3d at 543, at which a defendant may "testify in their own behalf, present information by proffer or otherwise, and cross-examine witnesses who appear at the hearing," *Salerno*, 481 U.S. at 751.

*Third*, Defendants do not make any express findings explaining why detention is necessary and why there are no alternative conditions of release that

could mitigate any identifiable risk.  "Explicit judicial findings 'serve several worthy purposes: They help to assure a realistic review by providing a method of evaluating a judge's decision or order; they guard against careless decision making by encouraging the trial judge to express the grounds for his decision; and they preserve public confidence in the fairness of the judicial process.'"  *In re Humphrey*, 228 Cal. Rptr. 3d at 536 (citation omitted).  Defendants do not provide any reasons why a person is detained in Cullman County, except for blunt inability to pay.  *See ODonnell*, 882 F.3d at 542 (finding that procedural due process under a state-created liberty interest required magistrates to "specifically enunciate" on the record "their individualized, case-specific reasons" why detention is necessary).

*Fourth*, Defendants are not required to satisfy <u>any</u> evidentiary burden before a person is detained—let alone the clear and convincing standard of proof that this Court should find is the minimum required.  *See In re Humphrey*, 228 Cal. Rptr. 3d at 535 ("We believe the clear and convincing standard of proof is the appropriate standard because an arrestee's pretrial liberty interest, protected under the due process clause, is 'a fundamental interest second only to life itself in terms of constitutional importance.'") (citation omitted).

The Supreme Court—applying *Mathews v. Eldridge*—has consistently held that deprivations of physical liberty require, at a minimum, a heightened,

intermediate standard of proof. *See, e.g.*, *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992) (While "[t]he State may . . . confine a mentally ill person if it shows by 'clear and convincing evidence that the individual is mentally ill and dangerous,' [h]ere, the State has not carried that burden.") (citation omitted); *Cruzan by Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261, 282–83 (1990) (noting clear and convincing evidence required in deportation, civil commitment, denaturalization, civil fraud, and parental termination proceedings); *Santosky v. Kramer*, 455 U.S. 745, 756 (1982) ("This Court has mandated an intermediate standard of proof— 'clear and convincing evidence'—when the individual interests at stake in a state proceeding are both 'particularly important' and 'more substantial than mere loss of money.'") (citation omitted); *Addington v. Texas*, 441 U.S. 418 (1979) (requiring at least clear and convincing standard in civil commitment for mental illness proceeding).

*Fifth*, Defendants do not make counsel available to arrestees before they are detained. In *Turner*, the Court held that the "right procedures" could substitute for counsel at civil contempt proceedings—if the State was <u>not</u> represented—because the inquiry into indigency is often "sufficiently straightforward." 424 U.S. at 446. However, there is nothing straightforward about a detention decision, which requires a court to weigh multiple competing factors. Indeed, empirical evidence suggests that counsel is the single most important factor determining the length of

pretrial detention and is necessary to guard against self-incrimination and to marshal evidence necessary to cogently articulate why an arrestee should not be detained. *See* Douglas L. Colbert et. al., *Do Attorneys Really Matter?*, 23 Cardozo L. Rev. 1719, 1720, 1773 (2002) ("legal representation at bail often makes the difference between an accused regaining freedom and remaining in jail prior to trial," while delaying appointment of counsel is the most powerful cause of lengthy pretrial detention); *see also* Wayne R. LaFave, et al., 4 Crim. Proc. § 12.1(c) (4th ed. 2016) (finding that 75% of represented defendants at bail hearings are released on their own recognizance compared to only 25% of non-represented defendants).

* * *

This Court should find that Plaintiff is substantially likely to prevail on his Fourteenth Amendment claims, because the constitutional protections of equal protection and procedural and substantive due process prohibit wealth-based detention without an individualized hearing with adequate procedural protections, including an inquiry into and findings concerning ability to pay, the suitability of non-financial conditions of release, and a finding on the record that there is at least clear and convincing evidence that any conditions of release are the least restrictive conditions necessary to achieve public safety and court appearance. *See In re Humphrey*, 228 Cal. Rptr. 3d at 545.

**B.  Mr. Hester and the Putative Class Will Suffer Immediate and Irreparable Injury Unless a Preliminary Injunction Issues.**

Without a preliminary injunction, putative class members will continue to be unconstitutionally jailed.  Imprisonment in violation of one's constitutional rights is an irreparable harm.  Even one additional night in jail is a harm to a person that cannot be later undone.  *See, e.g.*, *United States v. Bogle*, 855 F.2d 707, 710–11 (11th Cir. 1988) ("unnecessary deprivation of liberty clearly constitutes irreparable harm"); *Wanatee v. Ault*, 120 F. Supp. 2d 784, 789 (N.D. Iowa 2000) (same).

Moreover, depriving persons of their fundamental right to pretrial liberty may cause psychological and economic harm and undermine their ability to prepare a defense.  As the Supreme Court has explained, pretrial incarceration

> has a detrimental impact on the individual.  It often means loss of a job; it disrupts family life; and it enforces idleness.  Most jails offer little or no rehabilitative programs.  The time spent in jail is simply dead time.  Moreover, if a defendant is locked up, he is hindered in his ability to gather evidence, contact witnesses, or otherwise prepare his defense.  Imposing those consequences on anyone who has not yet been convicted is serious.  It is especially unfortunate to impose them on those persons who are ultimately found to be innocent.  Finally, even if an accused is not incarcerated prior to trial, he is still disadvantaged by restraints on his liberty and by living under a cloud of anxiety, suspicion, and often hostility.

*Barker v. Wingo*, 407 U.S. 514, 532–33 (1972); *see also Pugh*, 572 F.2d at 1056–57.  Empirical evidence establishes that those detained pretrial suffer worse outcomes at trial and sentencing than those released pretrial, even when charged

with the same offenses.[21]   Those detained pretrial are more likely to plead guilty solely to shorten their jail time, even if innocent.  *See, e.g.*, *ODonnell*, 882 F.3d at 537 (affirming district court's findings—based on "voluminous empirical data and academic literature"—that "the expected outcomes for an arrestee who cannot afford to post bond are significantly worse than for those arrestees who can," "indigent arrestees who remain incarcerated because they cannot make bail are significantly more likely to plead guilty and to be sentenced to imprisonment," and "pretrial detention can lead to loss of [a] job, family stress, and even an increase in likeliness to commit crime").

For these reasons, the Court should find that the putative class will suffer irreparable injury without a preliminary injunction.  *See, e.g.*, *Edwards*, 2017 WL 2255775, at *1; *ODonnell*, 251 F. Supp. 3d at 1157–58; *Rodriguez*, 155 F. Supp. 3d at 771; *Cooper*, 2015 WL 10013003, at *2.

## C. The Threatened Injury to the Putative Class Outweighs Any Potential Harm a Preliminary Injunction Might Cause.

The threat of injury to Mr. Hester and the putative Class considerably

---

[21] *See, e.g.*, Christopher T. Lowenkamp et al., Laura & John Arnold Found., *Investigating the Impact of Pretrial Detention on Sentencing Outcomes* 4 (Nov. 2013), https://goo.gl/EThuzH, attached as Ex. N to West Decl. (those detained for the entire pretrial period are more likely to be sentenced to jail and prison—and receive longer sentences—than those who are released at some point before trial or case disposition); Megan Stevenson, *Distortion of Justice: How the Inability to Pay Bail Affects Case Outcomes* 17–18 (Jan. 8, 2017), https://goo.gl/oUuh6n, attached as Ex. O to West Decl. (finding that a person who is detained pretrial is 13% more likely to be convicted and 18% more likely to plead guilty than a person who is not detained); Gupta,, *supra* note 17, at 15 (finding use of secured money bail increases the likelihood that a defendant is found guilty by 12 percent).

outweighs any threat of harm to Defendants.  Without immediate injunctive relief, putative Class members will be unconstitutionally jailed because they cannot "forthwith pay" the amount required by the bail schedule.  *Tate*, 401 U.S. at 398. Jailing the putative Class because of their poverty may also result in additional harms: it disrupts families, employment, and coerces guilty pleas, *see Jones*, 2015 WL 5387219, at *3; those detained until disposition are also more likely to be sentenced to jail or prison than those who are released before trial.[22]

A preliminary injunction would not undermine public safety.  As the Alabama Supreme Court explained, keeping indigent people in jail because they cannot afford to pay secured money bail does not protect public safety.  *See Blake*, 642 So.2d at 968.  Instead, empirical evidence suggests that Cullman County will be safer by ceasing to needlessly detain the poor.[23]

Empirical evidence also suggests that a preliminary injunction will not increase the likelihood that a defendant will fail to appear.  Rather, Defendants could safely release many arrestees on unsecured bond or other non-financial conditions without any impact on the administration of justice.[24]  In fact, empirical

---

[22] *See* Lowenkamp, *Investigating the Impact of Pretrial Detention on Sentencing Outcomes*, *supra* note 21, at 3 (concluding that defendants who are detained for the entire pretrial period are much more likely to be sentenced to jail and prison—and also receive longer jail and prison sentenced—than those who are released at some point before trial and case disposition).

[23] *See supra* note 19.

[24] Jones, *Unsecured Bonds*, *supra* note 17 at 16 ("When released defendants fail to appear, unsecured bonds offer the same probability of fugitive-return as do secured (including surety-only) bonds.").

evidence suggests that pretrial detention may *increase* the likelihood that a defendant will fail to appear.[25]

Defendants will also likely save money if this Court grants a preliminary injunction.[26]   As one federal judge recently explained, "unnecessary pretrial detention burdens States, localities, and taxpayers, and its use appears widespread: nationwide, about 60 % of jail inmates are pretrial detainees, and the majority of those people are charged with nonviolent offenses." *Jones*, 2015 WL 5387219, at *3.   Nationally, local governments spend $13.6 billion per year on pretrial detention.[27]   Most of the people in pretrial detention are in jail because they are too poor to pay secured money bail.   "Money, or the lack thereof, is now the most important factor in determining whether someone is held in jail pretrial."[28]   Cullman County is no different, given that Defendants condition arrestees' freedom solely on the payment of secured money bail.

---

[25] *See* Lowenkamp, *The Hidden Cost of Pretrial Detention*, *supra* note 19 at 4 (concluding that longer pretrial detention is associated with the likelihood of failure to appear pending trial); Gupta et al., *The Heavy Costs of High Bail*, *supra* note 17 at 21 ("Our results suggest that money bail has a negligible effect or, if anything, increases failures to appear.").

[26] Pretrial Justice Institute, *Pretrial Justice: How Much Does It Cost?*, https://goo.gl/0lLtLM, attached as Ex. BB to West Decl. ("It has been estimated that implementing validated, evidence-based risk assessment to guide pretrial release decisions could yield $78 billion in savings and benefits, nationally."); United States Court, *Supervision Costs Significantly Less than Incarceration in Federal System* (July 18, 2013), https://goo.gl/dJpDrn, attached as Ex. CC to West Decl. (In 2012, "[p]retrial detention for a defendant was nearly 10 times more expensive than the cost of supervision of a defendant by a pretrial services officer in the federal system.").

[27] Peter Wagner & Bernadette Rabuy, Prison Policy Initiative, *Following the Money of Mass Incarceration* (Jan. 25, 2017), https://goo.gl/cXZJbL, attached as Ex. DD to West Decl.

[28] Ram Subramanian et al., Vera Institute of Justice, *Incarceration's Front Door: The Misuse of Jail in America* 32 (Feb. 2015) (updated July 29, 2015), https://goo.gl/JgPQjP, attached as Ex. EE to West Decl.

**D.   An Injunction Would Serve the Public Interest.**

The public interest weighs in favor of Plaintiff and the putative Class.  No harm to the public interest would result from issuing an injunction.  Instead, the public interest strongly favors preventing constitutional deprivations.  *See Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 458 n.9 (5th Cir. 2014); *Awad v. Ziriax*, 670 F.3d 1111, 1132 (10th Cir. 2012).

Detaining indigent arrestees has significant negative consequences for the public interest.  The evidence suggests that keeping indigent people in jail—even for a few days after an arrest—has terrible consequences.  First, it is enormously expensive to house people in jail.[29]  Second, jailing the poor can devastate lives by disrupting stable employment and child custody arrangements.  *See ODonnell*, 882 F.3d at 537; *see also Jones*, 2015 WL 5387219, at *3.    Third, even 48 hours in jail after an arrest leads to worse outcomes for all involved: it increases poverty, harms families, and increases recidivism.[30]  All of these factors highlight that the public interest is furthered by pretrial release and by a system that grants all arrestees the freedom currently limited to those wealthy enough to purchase it.

---

[29] *See See supra* note 26.

[30] *See* Schnacke, *supra* note 15 at 12–15; *see also* Lowenkamp, *The Hidden Costs of Pretrial Detention, supra* note 19 at 3 (studying 153,407 defendants and finding "when held 2–3 days, low risk defendants are almost 40 percent more likely to commit new crimes before trial than equivalent defendants held no more than 24 hours"); Arnold Foundation, *Pretrial Criminal Justice Research Summary* 5 (Nov. 2013), https://goo.gl/Fcn5N0, attached as Ex. PP to West Decl. (finding "low-risk defendants held 2–3 days were 17 percent more likely to commit another crime within two years" and those detained "4–7 days yielded a 35 percent increase in re-offense rates").

**E.   The Court Should Not Require Plaintiff to Post a Security.**

The Court should issue injunctive relief without requiring Mr. Hester to post security.  Rule 65(c) permits security to protect the other party from any financial harm caused by a temporary injunction, but under this Circuit's "interpretation of Rule 65(c), the amount of security required by the rule is a matter within the discretion of the trial court," which "may elect to require no security at all."  *City of Atlanta v. Metro. Atlanta Rapid Transit Auth.*, 636 F.2d 1084, 1094 (5th Cir. Unit B Feb. 1981) (quotation and citation omitted).

Mr. Hester is indigent, and his inability to post bond should not prevent him from obtaining a court order to protect his constitutional rights.  Hester Decl. ¶ 4; *see also Wayne Chem. v. Columbus Agency Serv. Corp.*, 567 F.2d 692, 701 (7th Cir. 1977) (affirming no bond for indigent); *Johnson v. Bd. of Police Comm'rs*, 351 F. Supp. 2d 929, 952 (E.D. Mo. 2004) (no bond for homeless plaintiffs).

Moreover, Mr. Hester is "engaged in public-interest litigation, an area in which the courts have recognized an exception to the Rule 65 security requirement" because requiring security would deter others from exercising their constitutional rights.  *City of Atlanta*, 636 F.2d at 1094.

Finally, as explained in detail in Section III.A, *supra*, Mr. Hester is likely to succeed on the merits.  The outcome of any trial, if necessary, is likely to reaffirm the well-established principle that a person may not be jailed on a monetary

amount that he cannot afford.  *See Moltan Co. v. Eagle-Picher Indus., Inc.*, 55 F.3d 1171, 1176 (6th Cir. 1995) ("no security was needed because of the strength of [Plaintiff's] case and the strong public interest involved").

## IV.   CONCLUSION

For the foregoing reasons, the balance of equities tips sharply in favor of issuing injunctive relief enjoining Sheriff Gentry from prospectively jailing arrestees unable to pay secured monetary bail without an individualized hearing with adequate procedural safeguards that include an inquiry into and findings concerning their ability to pay, the suitability of alternative non-financial conditions of release, and a finding on the record by at least clear and convincing evidence that any conditions of release are the least restrictive conditions necessary to achieve public safety and court appearance.

Dated: March 12, 2018.           Respectfully submitted,


                                 /s/ Micah West
                                 Micah West
                                 *On behalf of Attorneys for Plaintiff*

                                 Samuel Brooke (ASB-1172-L60B)
                                 Micah West (ASB-1842-J82F)
                                 SOUTHERN POVERTY LAW CENTER
                                 400 Washington Avenue
                                 Montgomery, AL  36104
                                 P:  (334) 956-8200
                                 F:  (334) 956-8481
                                 E: samuel.brooke@splcenter.org
                                 E: micah.west@splcenter.org

Alec Karakatsanis (DC Bar No. 999294)*
Katherine Hubbard (Cal. Bar No. 302729)*
CIVIL RIGHTS CORPS
910 17th Street NW, Suite 500
Washington, DC  20006
P: (202) 930-3835
E: alec@civilrightscorps.org
E: katherine@civilrightscorps.org

Randall C. Marshall (ASB-3023-A56M)
Brock Boone (ASB-2864-L11E) [Δ]
ACLU FOUNDATION OF ALABAMA, INC.
P.O. Box 6179
Montgomery, AL  36106-0179
P: (334) 420-1741
E: rmarshall@aclualabama.org
E: bboone@aclualabama.org

Brandon Buskey (ASB-2753-A50B)*
Andrea Woods (Wash. Bar No. 48265)*
AMERICAN   CIVIL   LIBERTIES   UNION
FOUNDATION
CRIMINAL LAW REFORM PROJECT
125 Broad Street, 18th Floor
New York, NY  10004
P: (212) 549-2654
E: bbuskey@aclu.org

*admitted pro hac vice
**Attorneys for Plaintiffs**

## CERTIFICATE OF SERVICE

I hereby certify that on this date the foregoing was filed through the Court's CM/ECF filing system, and by virtue of this filing notice will be sent electronically to all counsel of record, including:

J. Melvin Hasting
LAW OFFICE OF MELVIN HASTING LLC
P.O. Box 517, Cullman, AL 35058
mhasting@hiwaay.net
*Counsel for Plaintiffs R.C. Schultz, D.T. Beebe, T.D. Beebe, J.H. Sterling*

Thomas E. Drake, II
THE DRAKE LAW FIRM
419 Second Avenue SW, Suite B, Cullman, AL 35055
tomdrake@bellsouth.net
*Counsel for Plaintiffs R.L. Parris, T.L. Turney, J. Stark, K. Yarbrough, R. Meeks, G.M. Culwell Jr., M. Anderson, J.R. Shelton*

Steven Troy Marshall
James W. Davis
Laura E. Howell
BRAD A. CHYNOWETH
OFFICE OF THE ATTORNEY GENERAL
501 Washington Avenue, Montgomery, AL 36130
smarshall@ago.state.al.us
jimdavis@ago.state.al.us
lhowell@ago.state.al.us
bchynoweth@ago.state.al.us
*Counsel for Defs. State, Magistrate White, Magistrate Black, Circuit Clerk McSwain*

Jamie Helen Kidd
WEBB & ELEY PC
7475 Halcyon Pointe Drive, Montgomery, AL 36124
jkidd@webbeley.com
*Counsel for Defs. Sheriff Gentry, Walker, Watson, Marchman, Cullman Cty. Comm'n*

J. Dorman Walker
BALCH & BINGHAM LLP
P.O. Box 78, Montgomery, AL 36101
dwalker@balch.com
*Counsel for Defs. Judge Williams, Helms, Alabama Administrative Office of the Court*

on this March 13, 2018.

/s/ Micah West
Micah West