FILED

2018 Sep-04  PM 06:09
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | |
|---|---|
| **RAY CHARLES SCHULTZ, et al.,**<br>        **Plaintiffs,**<br><br>        **v.**<br><br>**STATE OF ALABAMA, et al.,**<br>        **Defendants.**<br>------------------------------------------<br>**RANDALL PARRIS, on behalf of**<br>**himself and those similarly situated,**<br>**et al.,**<br>        **Plaintiff-Intervenor,**<br><br>        **v.**<br><br>**MARTHA WILLIAMS, et al.,**<br>        **Defendants.**<br>------------------------------------------<br>**BRADLEY HESTER, on behalf of**<br>**himself and those similarly situated,**<br>        **Plaintiff-Intervenor,**<br><br>        **v.**<br><br>**MATT GENTRY, et al.,**<br>        **Defendants.** | **Case No. 5:17-cv-00270-MHH** |

## <u>MEMORANDUM OPINION AND ORDER</u>

Bradley Hester was arrested and jailed in Cullman County.  He was, and

others similarly situated are, detained in the Cullman County jail following arrest because they cannot afford to post a surety bond or a property bond as a condition of pretrial release.  Mr. Hester asks the Court to preliminarily enjoin the Cullman County Sheriff from detaining indigent defendants who cannot afford to post a property bond or a surety bond as a condition of pretrial release.  Mr. Hester argues that Cullman County's procedures for setting a secured bond as a condition of pretrial release are constitutionally flawed, and he argues that the way in which Cullman County implements those procedures is inequitable.  (Doc. 102).[1]  For the following reasons, the Court finds that Mr. Hester is entitled to a preliminary injunction.

## I.     BACKGROUND

### A.     <u>Procedural Background</u>

On March 8, 2018, Mr. Hester intervened in this action.  (Doc. 94).  The following day, Mr. Hester filed his intervenor complaint against Cullman County Sheriff Matt Gentry, Circuit Clerk Lisa McSwain, Magistrate Amy Black, Magistrate Joan White, District Court Judge Kim Chaney, and District Court Judge

---

[1] As will be discussed in greater detail below, when Mr. Hester filed his motion for preliminary injunction, Cullman County followed pretrial procedures different from the procedures in place as of the date of this opinion.  Therefore, the language of Mr. Hester's motion pertains to the old version of Cullman County's pretrial procedures.  Two weeks after Mr. Hester filed his motion for preliminary injunction, Cullman County revised its pretrial procedures.  The parties have conformed their evidence, and the Court conforms its analysis, to Cullman County's new pretrial procedures.  The Court considers whether Mr. Hester and the proposed plaintiff class have demonstrated a substantial likelihood of success on their constitutional claims as those claims pertain to Cullman County's new pretrial procedures.

Wells R. Turner III.  (Doc. 95).  In his first claim for relief, citing the Fourteenth Amendment, Mr. Hester alleges that the defendants violate the "fundamental rights" of indigent criminal defendants arrested in Cullman County "by enforcing against them a post-arrest system of wealth-based detention" pursuant to which indigent defendants "are kept in jail because they cannot afford a monetary amount of bail."  (Doc. 95, p. 18, ¶ 80).  In his second claim for relief, Mr. Hester alleges that the defendants do not provide counsel for bail hearings, give arrestees an adequate opportunity to testify or present evidence at bail hearings, apply a uniform evidentiary standard to determine whether a person should be detained prior to trial, or "require a [judicial] finding that no affordable financial or non-financial condition of release will ensure appearance or public safety before jailing pretrial arrestees on monetary bail amounts that they cannot afford."  (Doc. 95, p. 19, ¶ 85).[2]  Mr. Hester asserts that the defendants create *de facto* detention orders that apply to only indigent criminal defendants in Cullman County.  Mr. Hester seeks declaratory relief from the judicial defendants -- Circuit Clerk McSwain, Magistrate Black, Magistrate White, Judge Chaney, and Judge Turner -- and injunctive relief from Sheriff Gentry.  (Doc. 95, pp. 20-21, ¶¶ c-f).

Mr. Hester has asked the Court to certify this lawsuit as a class action and "certify a class consisting of all state-court arrestees who are or who will be jailed

---

[2] Mr. Hester brings a third claim concerning the promptness of the release hearing.  (Doc. 95, p. 20).  Mr. Hester does not pursue early relief for that claim.

in Cullman County who are unable to pay the secured monetary bail amount required for their release." (Doc. 101, p. 2). The defendants do not oppose class certification should this case proceed. (Doc. 144, p. 8; Doc. 145, p. 1). Mr. Hester also has asked the Court to preliminarily enjoin Sheriff Gentry "from prospectively jailing arrestees unable to pay secured monetary bail." (Doc. 102, p. 2).

The judicial defendants filed opposition to Mr. Hester's motion for preliminary injunction. (Doc. 122). In addition to arguing that Mr. Hester has not satisfied the standard for a preliminary injunction, the judicial defendants contend that Cullman County's recent adoption of new bail procedures moots Mr. Hester's claims for injunctive relief. (Doc. 122, p. 32). Sheriff Gentry has asked the Court to dismiss Mr. Hester's claims for injunctive relief. (Doc. 123).[3]

On April 12 and 13, 2018, the Court held a hearing on the motion for preliminary injunction. (Docs. 136, 143). Dr. Stephen Demuth, whom the Court admitted as an expert in statistical analysis and quantitative research methods related to pretrial detention and release processes, testified for Mr. Hester. (Doc. 136, pp. 36-40). Judge Truman Morrison of the Superior Court of the District of Columbia, whom the Court admitted as an expert in bail setting procedures, also testified for Mr. Hester. (Doc. 136, pp. 118-21). Sheriff Gentry and Judge Turner testified for the defendants. (Doc. 136, pp. 187, 268). The parties provided

---

[3] The Court will resolve Sheriff Gentry's motion to dismiss by separate order.

additional evidence via affidavit and stipulated to certain facts relevant to Mr. Hester's motion for preliminary injunction.  (Docs. 132-135, 138-140, 146, 148, 153).  On this record, the Court considers Mr. Hester's request for a preliminary injunction.

### B.  **Factual Background**

In Cullman County, individuals charged with crimes are taken into custody either pursuant to a probable cause warrantless arrest or pursuant to an arrest warrant issued by one of the county's magistrates.  Most arrests in Cullman County are warrantless probable cause arrests.  (Doc. 136, pp. 235-36; Doc. 143, p. 194).[4]

Under Alabama law, absent a capital murder charge, arrestees have a statutory right to bail.  (Doc. 136, p. 285; *see generally* Ala. Code §§ 15-13-106, -108).[5]  In Cullman County, bail initially is set as a condition of pretrial release for every arrestee.  The staff of Cullman County's Sheriff's Office selects the initial bail amount for individuals jailed for warrantless probable cause arrests;

---

[4] By way of example, in February 2018, Cullman County took 159 individuals into custody pursuant to warrantless arrests, and the county took 61 individuals into custody pursuant to arrest warrants.  (Doc. 143, p. 191).

[5] Alabama Code § 15-13-106 states:  "Except in capital cases where there is no right to release on bail, no person or defendant shall be committed to any jail in the State of Alabama on a warrant unless there is an amount of bail affixed to the warrant. No person or defendant shall remain in jail anywhere in this state for more than 24 hours for any felony or misdemeanor case without an order of bail, unless bail is not authorized by law."  Alabama Code § 15-13-108 states:  "In all cases of misdemeanors and felonies, unless otherwise specified, the defendant is, before conviction, entitled to bail as a matter of right. All sheriffs and police chiefs of this state shall ensure that one of their officers or themselves are available to approve and accept bail 24 hours each day, seven days a week, except during the hours the clerks of the courts provide personnel for bail acceptance and approval."

magistrates select the initial bail amount in arrest warrants.  (Doc. 136, pp. 206, 275).[6]  Because most of the arrests in Cullman County are warrantless arrests, the Sheriff's Office sets most of the initial bail amounts in the county.  Both the sheriff and the magistrates use a bail schedule to determine the bail amount.  On an average day, there are ten arrests in Cullman County, and six of those arrestees are immediately bail eligible.  (Doc. 136, p. 193).[7]

Cullman County primarily uses property bonds and surety bonds to meet the bail condition for pretrial release of arrestees.  In the case of a property bond, a criminal defendant's relative or neighbor may post property (typically real property, but occasionally a vehicle) to secure the defendant's release.  (Doc. 136, pp. 190-92, 224).  By state statute, Cullman County must assess a $35 bond fee for property bonds.  (Doc. 136, p. 192).[8]  Bonding companies provide surety bonds.

---

[6] In Cullman County, magistrates are court specialists, but they are not lawyers.  They are not members of the Alabama State Bar.  (Doc. 136, p. 270).  Magistrates make probable cause determinations on warrantless arrests within 48 hours of arrest.  A criminal defendant typically does not attend a probable cause determination; only the arresting officer attends that proceeding.  (Doc. 136, pp. 269-71).

[7] Even if they can afford to post bond, the sheriff cannot immediately release the following categories of defendants:  defendants arrested for failure to appear or on charges that, by statute, require detention for a period of time; defendants who are intoxicated; defendants who are in need of medical attention; or defendants who have holds on their detention from other jurisdictions.  (Doc. 129-36, p. 3; Doc. 136, p. 276).

[8] Sheriff Gentry testified that he encourages family members of arrestees to post property bonds because his office can quickly assess the value of the property using the county's tax records, and a property bond can be obtained with the payment of a $35 fee.  (Doc. 136, pp. 224-226).  Sheriff Gentry explained that his office can use the contact information provided with a property bond to contact family members if a defendant fails to appear for a hearing.  He acknowledged

Cullman County advertises the telephone numbers for bonding companies in its jail cells.  An arrestee may call a bonding company, "work out an agreement . . . on a set price for that bonding company" to post bond, and secure her release from jail. (Doc. 136, p. 191).[9]

Sheriff Gentry testified that he has two primary interests in the pretrial process:  getting defendants to appear for court proceedings and ensuring the safety of the community.  (Doc. 136, pp. 235-36).  Those interests are consistent with Alabama law.   Pursuant to Rule 7.2(a) of the Alabama Rules of Criminal Procedure, conditions of pretrial release are imposed to "reasonably assure the defendant's appearance" at court proceedings and to protect "the public at large" from "real and present danger."  Ala. R. Crim. P. 7.2.

1.    Pre-March 26, 2018

Until March 26, 2018, Cullman County used a bail schedule that identified a range of bail for various state criminal offenses.  (Doc. 129-34; Doc. 132, p.1, ¶ 1). For each individual arrested, Sheriff Gentry set bail based on the crime charged and then released criminal defendants who could post a secured bond for the bail

---

that he would have the same ability if a defendant identified a third-party custodian in conjunction with an unsecured bond.  (Doc. 136, pp. 225-28).

[9] Cullman County also uses cash bonds and ROR (release on recognizance) bonds.  By law, the sheriff cannot accept cash bonds; only the clerk of court may accept cash bonds.  There is no financial obligation for ROR bonds.  The arrestee "just promise[s]" that she will return for court dates.  If she does not appear as promised, then a judge will issue an arrest warrant for the individual.  (Doc. 136, pp. 189-90).

amount and detained criminal defendants who could not afford to post bond.  (Doc. 132, p. 2, ¶¶ 7-8).

Cullman County magistrates conducted initial appearances for arrestees who could not afford to post bond.  (Doc. 132, pp. 2-3, ¶¶ 10, 12).  The initial appearance was conducted by video conference, and the state did not offer counsel for the appearance.  (Doc. 132, pp. 2-3, ¶¶ 10, 13).  At the initial appearances, the magistrates informed the arrestees of their bail amount but did not evaluate the bail amount to determine whether the bail amount exceeded the amount necessary to satisfy the statutory purposes of bail.  (Doc. 132, p. 3, ¶ 14).  Arrestees who could not afford to post a secured bond had to remain in jail and file a motion to reconsider their bail amount.  (Doc. 132, p. 2, ¶ 9).  Typically, a district judge would not consider such a motion until several weeks after arrest.  (Doc. 132, p. 2, ¶ 9).

The parties dispute the number of arrestees who were detained each month solely because they could not afford to post bail under this system.  According to Alacourt records, Alabama's electronic trial management system, during the month of February 2018, 85 of 235 arrestees (i.e. 34%) who were eligible to secure their release by posting a secured bond were unable to post bond within 72 hours after arrest.  (Doc. 129-9, p. 3, ¶¶ 3-4; Doc. 136, pp. 262-63).  Of those 85 arrestees, 36 (i.e. 42%) never received an initial appearance.  (Doc. 129-9, pp. 3-4, ¶ 5).  Two

arrestees received an initial appearance more than 72 hours after arrest.  (Doc. 129-9, p. 4, ¶ 5).  The remaining 47 arrestees received an initial appearance within 72 hours of arrest.  (Doc. 129-9, p. 3, ¶ 5).

The defendants contend that Alacourt records are not necessarily reliable because the records do not contain all relevant information, and the Alacourt system experiences lag time between entering and displaying data.  (Doc. 136, p. 262; Doc. 143, p. 65).  According to a Cullman County detention data sheet that Sheriff Gentry submitted, of the 220 new arrests made in February 2018, 167 arrestees (i.e.  76%) were released without need for an initial appearance within 72 hours of arrest.  (Doc. 139-2; *see* Doc. 143, pp. 190-93; 210-13).  Of those 220 new arrests, 159 arrests were made without a warrant, all but 14 of which (i.e. 91%) posted bond within 48 hours after arrest without having to wait for an initial appearance.  (Doc. 139-2; *see* Doc. 143, pp. 194-95).  Sheriff Gentry testified that the 14 arrestees who did not post bond may have been detained because they had a new probable cause arrest or a warrant for failure to appear during the month. (Doc. 143, pp. 194-95).

## 2.   March 26, 2018 Revisions to Bail Procedures

On March 26, 2018, the presiding circuit judge in Cullman County signed a "Standing Order Regarding Pre-Trial Appearance and the Setting of Bond" which established new pretrial detention and bail policies for the Cullman County.  (Doc.

129-36).   The Court first describes the procedures that the new Standing Order dictates.   The Court then describes the evidence concerning the way in which Cullman County has implemented the new Standing Order.

### a. March 26, 2018 Standing Order and Initial Appearance Procedures

Pursuant to the March 26, 2018 Standing Order, the Cullman County Sheriff still uses a bail schedule, but the new bail schedule provides specific amounts of bail for specific criminal charges.  (Doc. 129-36, p. 3; Doc. 129-37; *compare* Doc. 129-34, p. 2).  Some of the bail amounts listed in the new schedule are lower than the bail amounts in the previous schedule.  (*Compare* Doc. 129-34 *with* Doc. 129-37).  As with the former bail procedures, absent a capital murder charge, eligible defendants arrested without a warrant are released when they post a secured bond in the amount that Sheriff Gentry's staff sets per the bail schedule, regardless of the nature of the crime charged, the arrestee's criminal history, or the arrestee's prior record of failures to appear.  (Doc. 129-36, p. 3; Doc. 136, p. 206).  When the sheriff sets a bond amount for a warrantless arrest, "there's no leeway in . . . what your bond is going to be."  (Doc. 136, p. 206; *see also* Doc. 136, pp. 221-22).

The Sheriff's Office releases a defendant arrested pursuant to a warrant when the defendant posts bond in the amount set in the warrant.  (Doc. 129-36, p. 4; Doc. 143, p. 141).  Magistrates set bond in arrest warrants in the amount listed in the bail schedule.  (Doc. 129-36, p. 4; Doc. 136, p. 199; Doc. 143, p. 142).

For those who can afford to post a secured bond, ordinarily between 45 and 90 minutes elapse from the time an arrestee is booked in the Cullman County jail until the time she is released from jail on a secured bond.  (Doc. 136, p. 206).

According to the Standing Order, if a law enforcement officer believes that a defendant poses "an unreasonable risk of flight or danger to the public," then the officer may complete a bail request form and ask that bond be set in an amount different from the amount listed in the bail schedule.  (Doc. 129-36, pp. 3-4). Under the terms of the Standing Order, if an officer completes a bail request form for a defendant, then a magistrate may either grant the request and order the sheriff to detain the defendant until a district judge, within 72 hours of arrest, conducts an initial appearance and makes "an individualized determination of conditions of release, including the setting of bond," or deny the bail request "in which case the defendant shall be immediately released upon posting a bond on the terms contained in the schedule."  (Doc. 129-36, pp. 3-4).

The Standing Order provides that defendants who are unable to post a secured bond in the amount listed in the bail schedule are entitled to a judicial determination of the conditions of their release by a district judge held no later than 72 hours after arrest.  (Doc. 129-36, p. 5, n. 3; Doc. 143, pp. 48, 63).  A circuit judge must determine the conditions for release for a defendant who is arrested pursuant to a warrant issued upon an indictment.  (Doc. 129-36, p. 5, n.3).  The

judicial determination of conditions for release takes place at an initial appearance. If a defendant cannot pay the bond amount set by Sheriff Gentry or a magistrate, and the defendant does not receive an initial appearance within 72 hours of arrest, then Sheriff Gentry must release the defendant on an unsecured appearance bond in the amount set in the bail schedule.  (Doc. 129-36, p. 8).[10]

Before an initial appearance, a member of the Sheriff's Office meets with a defendant in jail and offers two forms to the defendant.[11]   A defendant may complete a "Release Questionnaire," and a defendant who indicates that she needs an attorney also may complete an "Affidavit of Substantial Hardship."  (Doc. 129-39; Doc. 129-41; Doc. 143, pp. 176-77; *see also* Doc. 136, pp. 216, 272, 277-78). Defendants may refuse the forms.  (Doc. 139-1, p. 1).

The release questionnaire states:   "FOR THE PURPOSE OF DETERMINING CONDITIONS OF PRE-TRIAL RELEASE IN THIS CASE, THE COURT MAY TAKE INTO ACCOUNT THE FOLLOWING."  (Doc. 129-41, p. 2).  The release questionnaire asks the defendant to supply information about her residence, employment, family situation, health, and criminal history, including

[10] Defendants who post bond at the time of their arrest later have to attend an initial appearance. At that proceeding, a judge informs a defendant of his court date, and the judge may appoint counsel to represent the defendant if the defendant demonstrates financial need.  (Doc. 136, pp. 300-01).

[11] Sheriff Gentry testified that he has two court liaisons on his staff.  These staff members offer a release questionnaire and an affidavit of financial hardship to an indigent defendant and, when necessary, the staff members will help a defendant complete the forms.  (Doc. 143, p. 177).

prior failures to appear.   (Doc. 129-41, pp. 2-3; Doc. 136, p. 279).   The questionnaire also asks the defendant to identify and provide contact information for nearest living relatives not living with the defendant and for as many as four individuals who can vouch for the defendant's "character, reputation and reliability." (Doc. 129-41, pp. 2-3; Doc. 136, p. 279).  The affidavit of substantial hardship asks the defendant to identify her employment, assistance benefits, monthly gross income, monthly expenses, and liquid assets.  (Doc. 129-39, pp. 2-3).  The sheriff's court liaison deputy delivers the completed forms to court, so that the forms are available to the judge at the initial appearance.  (Doc. 122-1, p. 3, ¶ 7; Doc. 136, p. 281).

Cullman County does not have a pretrial services department, so there is no one who independently gathers information for an initial appearance.  (Doc. 136, p. 288). The information that arrestees provide on the bail forms is not always accurate, often because arrestees may have difficulty understanding the forms. (Doc. 136, pp. 288-89).  As Judge Turner explained, the majority of the people who "come in contact with [] the criminal justice system" in Cullman County do not have "even a high school education."  (Doc. 136, p. 289).  "A lot of them are going to have learning disabilities.  A lot of them are going to have inability to read and comprehend."  (Doc. 136, p. 289).  Therefore, the examination of defendants during an initial appearance is an important source of information for the

determination of the conditions of bond.  (Doc. 136, p. 289).

The initial appearance typically is held remotely by video conference.  (Doc. 136, pp. 272-73).  At the initial appearance, the judge ensures that the defendant is aware of the charges against her, the right to be represented by counsel, and the right to remain silent.  (Doc. 129-40, p. 2; Doc. 136, p. 282).  The judge reviews the affidavit of substantial hardship, if the defendant has submitted one, to determine whether the defendant is indigent.  (Doc. 136, pp. 277-78).  If the judge determines that the defendant is indigent, then the court appoints counsel for the defendant, but under the Standing Order, appointed counsel is not available to a defendant during an initial appearance.  (Doc. 122-1, p. 5, ¶ 11; Doc. 129-36, pp. 2-8; Doc. 129-40, p. 2).

During an initial appearance, the judge determines the conditions of the defendant's release.  (Doc. 122-1, pp. 3-4, ¶ 8).  Pursuant to Rule 7.2(a) of the Alabama Rules of Criminal Procedure, the judge must consider releasing the defendant on the defendant's own recognizance or on an unsecured appearance bond unless the judge "determines that such a release will not reasonably assure the defendant's appearance as required, or the defendant's being at large will pose a real and present danger to the public at large."  (Doc. 122-1, p. 4, ¶ 9; Doc. 136, pp. 282-83m 286).  Rule 7.2(a) states:

> (a) BEFORE CONVICTION.  Any defendant charged with an offense bailable as a matter of right may be released pending or during trial on

his or her personal recognizance or on an appearance bond unless the court or magistrate determines that such a release will not reasonably assure the defendant's appearance as required, or that the defendant's being at large will pose a real and present danger to others or to the public at large.  If such a determination is made, the court may impose the least onerous condition or conditions contained in Rule 7.3(b) that will reasonably assure the defendant's appearance or that will eliminate or minimize the risk of harm to others or to the public at large.   In making such a determination, the court may take into account the following:

> 1.   The age, background and family ties, relationships and circumstances of the defendant.

> 2.  The defendant's reputation, character, and health.

> 3.  The defendant's prior criminal record, including prior releases on recognizance or on secured appearance bonds, and other pending cases.

> 4.  The identity of responsible members of the community who will vouch for the defendant's reliability.

> 5.  Violence or lack of violence in the alleged commission of the offense.

> 6.  The nature of the offense charged, the apparent probability of conviction, and the likely sentence, insofar as these factors are relevant to the risk of nonappearance.

> 7.  The type of weapon used, e.g., knife, pistol, shotgun, sawed-off shotgun.

> 8.  Threats made against victims and/or witnesses.

> 9.  The value of property taken during the alleged commission of the offense.

> 10.  Whether the property allegedly taken was recovered or not; damage or lack of damage to property allegedly taken.

11.  Residence of the defendant, including consideration of real property ownership, and length of residence in his or her place of domicile.

12.  In cases where the defendant is charged with a drug offense, evidence of selling or pusher activity should indicate a substantial increase in the amount of bond.

13.  Consideration of the defendant's employment status and history, the location of defendant's employment, e.g., whether employed in the county where the alleged offense occurred, and the defendant's financial condition.

14.  Any enhancement statutes related to the charged offense.

Ala. R. Crim. P. 7.2.  The Standing Order requires the judge to consider the fourteen factors in Rule 7.2(a).  (Doc. 129-36, pp. 5-7).

In weighing the factors that bear on a defendant's eligibility for release, the judge considers the information that the defendant provided in the release questionnaire and in the affidavit of substantial hardship, if the defendant submitted one.  (Doc. 136, pp. 277-81).  Judge Turner testified that when he is "considering factors to consider to release" a defendant, it is helpful for him to know whether a defendant "[is] employed or if they're not employed" and whether the defendant is "living where they say they are at that address or is that just where they get their mail."  (Doc. 136, p. 280).  With respect to the address information, Judge Turner stated:  "We have a lot of people that move from place to place wherever they can find to lay their head.  And [] keeping track of them can be

difficult at times." (Doc. 136, p. 281). Judge Turner also considers "the circumstances" of "the most recent arrest." (Doc. 136, p. 285). For example, in setting the conditions for a 26-year-old male defendant charged with unlawful possession of a controlled substance, Judge Turner considered the fact that the defendant previously served time in prison, and he considered the fact that the defendant was found hiding in a closet with a 14-year-old girl, "a factor to go with contributing to the delinquency of a minor." (Doc. 136, p. 287). Had that 26-year-old arrestee been able to afford bond, he would have been released as soon as he posted bond without regard to his criminal history or his association with a 14-year-old girl.

In addition to the questionnaire and the affidavit of substantial hardship, in the case of a warrantless arrest, the judge may consider the form that contains the arresting officer's statement of why the officer believed that she had probable cause to arrest the defendant. (Doc. 136, p. 281). According to the Standing Order, the judge "may elicit testimony about the defendant's financial condition," (Doc. 129-36, p. 7), but according to the Order on Initial Appearance and Bond Hearing form, the form that the judge completes during or following an initial appearance, the judge must "[give] the Defendant the opportunity to make a statement regarding his/her ability to post the bond currently set in this matter." (Doc. 129-40, p. 2).

The Standing Order provides that after considering the fourteen factors, the defendant's ability to post a secured bond, testimony from the defendant, and forms submitted to the Court, the Court "may release a defendant on his or her own recognizance, require the defendant to post an unsecured appearance bond, or require the posting of a secured appearance bond if that is the least onerous condition that will reasonably assure the defendant's appearance or that will eliminate or minimize the risk of harm to others or the public at large." (Doc. 129-36, p. 7). If there is "no less onerous condition for securing the defendant's appearance or protecting the public, then the Court may require a secured appearance bond in an amount less than, equal to, or greater than that contained in the bond schedule," even if the defendant cannot afford to post bond. (Doc. 129-36, p. 7). If the Court requires a secured bond, then the Standing Order states that "[t]he Court will make a written finding as to why the posting of a bond is reasonably necessary to assure the defendant's presence at trial in such a case" in "Section 6 of Form C-80 (Local), Order on Initial Appearance and Bond Hearing, and in Form C-52(g), Release Order." (Doc. 129-36, pp. 7-8).

Under the Standing Order, if a judge appoints counsel for an arrestee at an initial appearance, appointed counsel must meet with a defendant within seven days. (Doc. 136, pp. 290-91). It is not uncommon for a judge to set a bond in an amount he knows the defendant cannot afford. (Doc. 136, pp. 291-294).

Following her initial appearance, if a defendant still cannot afford to post bond, then the defendant may file a motion for bond reduction, and her appointed attorney may assist her.  (Doc. 122-1, p. 5, ¶ 11; Doc. 136, pp. 293, 295).  A judge typically hears the motion within a month.  (Doc. 136, pp. 297-98; Doc. 143, p. 97).

### b. *Implementation of the March 26, 2018 Standing Order*

The presiding judge of the Cullman County Circuit Court entered the new Standing Order two weeks after Mr. Hester filed his motion for preliminary injunction in this case.  (Docs. 102, 129-36).  Therefore, at the hearing on Mr. Hester's motion, the defendants were able to offer little evidence concerning the implementation of the new policy, but the limited evidence that the defendants did offer indicates that officials in Cullman County do not always comply with the written requirements in the new Standing Order.

For example, officials in Cullman County do not handle bail requests in a manner consistent with the new standing order.[12]  Law enforcement officers rarely use this tool.  Sheriff Gentry testified that bail requests from law enforcement officers "are very few and far between."  (Doc. 136, p. 207).  Judge Turner testified that he has never seen a bail request from a law enforcement officer in

---

[12] As will be discussed later in this opinion, law enforcement officers had the option of submitting bail request forms before Cullman County adopted the March 2018 Standing Order. The bail request tool is not new, but the Standing Order mandates new procedures concerning bail request forms.

conjunction with a warrantless arrest.  Judge Turner and Judge Chaney handle all bail requests tied to warrant arrests.  (Doc. 136, pp. 275-76).  In practice, a magistrate will not deny a bail request submitted with an application for an arrest warrant; magistrates refer all bail requests to a district judge.  (Doc. 143, p. 143).

In addition, although Cullman County has instituted a system purportedly designed to ensure that all arrestees who require an initial appearance see a judge within 48 hours, the system does not always work.  For example, on April 8, 2018, PEB was arrested on a charge of domestic violence third degree, harassment. (Doc. 136, pp. 217, 219; Doc. 139-1, p. 1).  The sheriff's staff set PEB's bond at $1,500 per Cullman County's bail schedule.  (Doc. 122-1, p. 16; Doc. 136, p. 219). PEB completed a release questionnaire and received an initial appearance on April 9, 2018.  (Doc. 136, pp. 217, 220; Doc. 139-1, p. 1).  The sheriff testified that this initial appearance took place before a magistrate; the Standing Order calls for an appearance before a judge.  As of April 11, 2018, PEB was still in jail, and he had not received a bail hearing within 48 hours.  (Doc. 136, p. 220).  PEB was released on a property bond on April 13, 2018.  (Doc. 136, p. 221).[13]

With respect to written findings concerning a *de facto* detention order, when a judge, based on the information that he reviewed in an initial appearance, decides to require secured bond as a condition for release, the Standing Order says that the

---

[13] The arrestee's initials are PEB.

judge must make "a written finding as to why the posting of a bond is reasonably necessary," but neither the Order on Initial Appearance and Bond Hearing nor the Release Order provides space for a written finding with respect to secured bond. (*See* Doc. 129-40, p. 3; Doc. 129-42, p. 2).   Instead, the Order on Initial Appearance and Bond Hearing requires a judge to check boxes beside 15 factors to identify the factors the judge took into "consideration" in requiring a secured bond. (Doc. 129-40, p. 3).   Fourteen of the factors listed come from Rule 7.2(a) of the Alabama Rules of Criminal Procedure, and the fifteenth factor is "Other," which the judge may specify in writing.  (Doc. 129-40, p. 3).[14]  The Release Order simply requires the judge to check a box if the court requires a secured bond.  (Doc. 129-40, p. 2).

## II.    ANALYSIS

### A. <u>The March 26, 2018 Standing Order does not moot Mr. Hester's motion for preliminary injunction.</u>

The defendants argue that the March 26, 2018 Standing Order ends the procedures that Mr. Hester challenges and therefore moots his claims.  (Doc. 122, p. 32).  The Court disagrees.

The legal principle on which the defendants' mootness argument rests is sound:  events that occur after a plaintiff files a lawsuit may "deprive the court of

---

[14] The bottom of the Order on Initial Appearance and Bond Hearing contains a few blank lines beside the statement "9.  Other:".  (Doc. 129-40, p. 3).  If he chose, a judge presumably could write findings concerning a secured bond in that section of the order.

the ability to give the plaintiff . . . meaningful relief," so that the plaintiff's claims become moot and the case "must be dismissed." *Al Najjar v. Ashcroft*, 273 F.3d 1330, 1336 (11th Cir. 2001) (citation omitted). "When government laws or policies have been challenged, the Supreme Court has held almost uniformly that cessation of the challenged behavior moots the suit." *Troiano v. Supervisor of Elections in Palm Beach Cty., Fla.*, 382 F.3d 1276, 1283 (11th Cir. 2004) (citations omitted).

Here, the mootness doctrine does not foreclose Mr. Hester's efforts to obtain relief because although the Cullman County Circuit Court has revised its written criminal pretrial procedures, the record demonstrates that the defendants do not fully comply with the new written procedures. And even if the defendants did comply, as discussed in greater detail below, the new procedures, though an improvement over the old, still are constitutionally deficient.

On the record before the Court at this early stage of the proceedings, there is a substantial likelihood that Mr. Hester will be able to prove that Cullman County's new criminal pretrial procedures violate putative class members' constitutional rights. Therefore, this case remains a live controversy in which the Court may give meaningful relief.

B. **Preliminary Injunction**

"A party seeking a preliminary injunction bears the burden of establishing

entitlement to relief." *Scott v. Roberts*, 612 F.3d 1279, 1289 (11th Cir. 2010). "To obtain such relief, the moving party must show: (1) a substantial likelihood of success on the merits; (2) that it will suffer irreparable injury unless the injunction is issued; (3) that the threatened injury outweighs possible harm that the injunction may cause the opposing party; and (4) that the injunction would not disserve the public interest." *GeorgiaCarry.Org, Inc. v. U.S. Army Corps of Engineers*, 788 F.3d 1318, 1322 (11th Cir. 2015) (citing *Burk v. Augusta–Richmond Cnty.,* 365 F.3d 1247, 1262-63 (11th Cir. 2004)). "A preliminary injunction is an extraordinary and drastic remedy that should not be granted unless the movant clearly carries its burden of persuasion on each of these prerequisites." *Id.* (alteration and internal quotation marks and citation omitted). Mr. Hester has satisfied all four elements.

### 1.   Substantial Likelihood of Success on the Merits

#### a.   *Fourteenth Amendment Right to Pretrial Liberty and Freedom from Wealth-Based Detention*

Mr. Hester argues that "[t]his case implicates two overlapping but distinct constitutional rights: the right against wealth-based detention and the right to pretrial liberty." (Doc. 108, p. 3). Mr. Hester contends that Cullman County's bail system cannot withstand constitutional scrutiny because it creates one standard of pretrial release for wealthy defendants and another for indigent defendants. The Court agrees.

Criminal defendants have a constitutional right to pretrial liberty.  The law presumes that defendants are innocent until the State proves otherwise.  Absent extenuating circumstances like flight risks or dangers to the community, the State may not incarcerate a defendant pretrial.  As the United States Supreme Court held in *United States v. Salerno*, 481 U.S. 739 (1987), the "interest in liberty" is "fundamental."  481 U.S. at 749-50.

Liberty is prohibitively expensive for indigent criminal defendants in a jurisdiction where secured bond is a condition of liberty, and judges set unattainable bond amounts that serve as *de facto* detention orders for the indigent. Pretrial "imprisonment solely because of indigent status is invidious discrimination and not constitutionally permissible."  *Pugh v. Rainwater*, 572 F.2d 1053, 1056-57 (5th Cir. 1978) (en banc) (citing *Tate v. Short*, 401 U.S. 395 (1971) and *Williams v. Illinois*, 399 U.S. 235 (1970)).  "The demands of equal protection of the laws and of due process prohibit depriving pre-trial detainees of the rights of other citizens to a greater extent than necessary to assure appearance at trial and security of the jail."  *Pugh*, 572 F.2d at 1057 (quoting *Rhem v. Malcolm*, 507 F.2d 333, 336 (2d Cir. 1974)) (internal marks omitted).  When a jurisdiction like Cullman County creates a criminal process pursuant to which "those with means avoid imprisonment" and "the indigent cannot escape imprisonment," the jurisdiction violates the Fourteenth Amendment.  *Frazier v. Jordan*, 457 F.2d 726, 726, 728

(5th Cir. 1972).[15]

The majority in *Walker v. City of Calhoun* described the confluence of equal protection and due process concepts in the constitutional analysis of pretrial release procedures:

> The Supreme Court synthesized that law in *Bearden v. Georgia*, which considered 'whether the Fourteenth Amendment prohibits a State from revoking an indigent defendant's probation for failure to pay a fine and restitution." 461 U.S. 660, 661, 103 S.Ct. 2064, 76 L.Ed.2d 221 (1983). The Court explained that '[d]ue process and equal protection principles converge in the Court's analysis' of cases where defendants are treated differently by wealth, observing that 'we generally analyze the fairness of relations between the criminal defendant and the State under the Due Process Clause, while we approach the question whether the State has invidiously denied one class of defendants a substantial benefit available to another class of defendants under the Equal Protection Clause." *Id*. at 665, 103 S.Ct. 2064.

*Walker v. City of Calhoun*, -- F.3d --, 2018 WL 4000252, *7 (11th Cir. Aug. 22, 2018). The *Walker* majority explained: "The *sine qua non* of a *Bearden*- or *Rainwater*-style claim, then, is that the State is treating the indigent and the non-indigent categorically differently." *Walker*, 2018 WL 4000252 at *8. The majority in *Walker* held that an indigent criminal defendant "who can show that the indigent are being treated systematically worse 'solely because of [their] lack of financial resources,'—and not for some legitimate State interest—will be able to

---

[15] Per *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc), decisions that the former Fifth Circuit Court of Appeals issued before October 1, 1981 are binding authority for courts in the Eleventh Circuit. *Id*. at 1209.

make out" a claim of a violation of the Fourteenth Amendment.  *Walker*, 2018 WL 4000252 at *8 (quoting *Bearden*, 461 U.S. at 661).[16]

The majority in *Walker* held that the plaintiff in that case did not demonstrate a substantial likelihood of success on his claim of wealth-based discrimination in the setting of municipal bail because the Standing Bail Order that the City of Houston adopted delayed but did not deprive indigent criminal defendants of pretrial release.  In fact, as the *Walker* majority held, the City of Calhoun's Standing Bail Order "guarantees release to indigents within 48 hours." 2018 WL 4000252 at *14, n. 12.  Indigent defendants in Cullman County receive no such guaranty; Cullman County affords that guaranty only to criminal defendants who have the financial means to post a bond at the time of arrest in an amount set in the county's bail schedule.

Unlike Cullman County, the release process in the City of Calhoun is fairly simple.  First, defendants arrested for a violation of a municipal law are released immediately on an unsecured bond.  2018 WL 4000252 at *1.  Those defendants are assessed the amount in the bail schedule only if they failed to appear for a court proceeding.  *Id.* at *2.  For defendants charged with a violation of a state law, the bail schedule lists bail in an amount equal to the fine that defendant later would

---

[16] The rights examined in *Pugh* and *Bearden* are quantitatively different because a defendant's pretrial rights -- a presumption of innocence and a fundamental right to pretrial liberty -- are broader that a defendant's rights following conviction.

have to pay if she were adjudged guilty of the crime charged.  The defendant may satisfy the bail obligation by paying cash, posting a property or surety bond, or using a driver's license as collateral.  *Id.* at *1.  At the time of arrest, if a defendant cannot provide any of these types of security, then a defendant must receive a hearing before a municipal judge within 48 hours.  That hearing has a single purpose:  using a uniform standard of indigency to evaluate evidence of indigency supplied to the court by a court-appointed attorney, a judge determines whether a defendant is, in fact, indigent.  A defendant who "has other resources that might reasonably be used" to secure release must provide the security that a judge orders to obtain release.  All defendants adjudged indigent under the city's uniform standard are released on a recognizance bond, "meaning no bail amount is set, either secured or unsecured."  *Id.* at *1-*2.

Thus, as the *Walker* majority found, the City of Calhoun releases *all* indigent defendants, just as the city releases all defendants who can afford to pay a cash bond, post a surety or property bond, provide a driver's license as collateral, or provide some other form of collateral.  The *Walker* majority found that delay of up to 48 hours in securing release for indigent defendants was presumptively constitutional.  *Id.* at *14.  The *Walker* majority held that the indigent in the City of Calhoun "must merely wait some appropriate amount of time to receive the same benefit as the more affluent" and that an appropriate period of delay, without more,

does not offend the Constitution.

Cullman County's bail process differs significantly from the process in the City of Calhoun because indigent defendants cannot secure their release merely by proving that they are indigent according to a uniform standard of indigency. Instead, within 72 hours of arrest, to obtain pretrial release in Cullman County, an indigent criminal defendant, without the assistance of counsel, must prove not only that he is indigent but also that he is not a flight risk or a threat to himself or the community.  If a judge, applying no particular legal standard, decides that a defendant is indigent but that the defendant is a danger to himself or his community or a flight risk, then the judge may set bail at a level that the defendant cannot afford, creating a *de facto* detention order.  (*See* Doc. 129-36, p. 37).

In the section that follows, the Court discusses the procedural deficiencies in Cullman County's bail system, but the Court first examines the inequitable treatment of arrestees on basis of wealth.  Under Cullman County's pretrial procedures, a dangerous arrestee who can post bond immediately returns to the community to which she is a threat, suffering only the inconvenience of detention of no more than two hours.  For example, Judge Turner confirmed that if a deputy sheriff were to arrest an individual on a charge of first degree rape, the Sheriff's Office would release the individual as soon as he could post a $20,000 property or surety bond.  (Doc. 143, p. 143).  If that same arrestee could not post bond, then he

would have to participate in an initial appearance before a district judge, and the judge would consider the conditions for release including the bond amount.  (Doc. 143, p. 144).  The bail order that a judge would enter likely would include a bond amount that the indigent defendant could not satisfy, completely depriving the defendant of the benefit of pretrial liberty that would have been available to him hours after his arrest, had he been able to afford a bond immediately.  The Standing Order permits this result, and the record shows that it is not unusual for a judge to set bond for an indigent defendant in an amount the defendant cannot afford. (Doc. 129-36, p. 7; Doc. 136, pp. 291-294).

Judge Turner acknowledged that if every arrestee in Cullman County had to go through the pretrial process that indigent defendants must follow, "drastically" higher numbers of defendants would be detained pretrial.  (Doc. 143, p. 67).  Judge Turner estimated that the number of pretrial detainees would quadruple.  (Doc. 143, pp. 67-68).  Judge Turner agreed with counsel for the judicial defendants that detaining non-indigent arrestees would not be a good thing because doing so would mean that many more people would suffer the deleterious consequences of pretrial detention.  (Doc. 143, pp. 67-68).[17]

---

[17] Judge Turner expressed his desire to learn about bail systems in other jurisdictions and to replicate systems that work well.  Judge Turner is receptive to alternative systems in Cullman County.  (Doc. 143, pp. 148-50).

Those harmful consequences are significant.  Mr. Hester's unrebutted evidence shows that deprivation of pretrial liberty takes a high toll on a criminal defendant, and the negative effects of pretrial incarceration compound each day that a defendant is detained.  Dr. Demuth explained that research literature increasingly "shows quite robustly that pretrial detention has deleterious consequences for the detained, the community at large, and the criminal justice system itself."  (Doc. 129-1, pp. 9-10).  As discussed in greater detail below, pretrial detention hampers a defendant's ability to participate in his defense.  Prolonged pretrial detention increases the likelihood that the pretrial detainee will enter a guilty plea, receive a harsher sentence, and recidivate.  (Doc. 129-1, pp. 11-12; Doc. 129-19, p. 8; Doc. 129-20, pp. 2, 4; Doc. 136, pp. 73-74).  And detention for even 24 hours can cause a defendant to lose a job, a consequence an indigent defendant cannot afford.  In Cullman County, these harmful consequences appear to be unacceptable for all but the indigent.

Mr. Hester is substantially likely to prove that Cullman County's discriminatory bail practices deprive indigent criminal defendants in Cullman County of equal protection of the law because the challenged distinction does not rationally further a legitimate state purpose.  *McGinnis v. Royster*, 410 U.S. 263, 270 (1973).  Instead, Cullman County's stated interests are illusory and conspicuously arbitrary.

The defendants argue that three compelling interests warrant secured bonds in Cullman County:  providing pretrial release as quickly as possible for all who can afford it (Doc. 143, pp. 125, 168), ensuring that criminal defendants appear for trial (Doc. 122-1, p. 6, ¶ 14; Doc. 143, pp. 171, 173), and protecting the community from dangerous criminal defendants (Doc. 143, pp. 413-14, 521).  Mr. Hester is likely to demonstrate that the defendants' secured money bail procedures are not necessary to serve any of these interests.

With respect to efficient pretrial release of criminal defendants, the defendants have demonstrated that the bail schedule enables the defendants to quickly release criminal defendants who can afford a bond.   Sheriff Gentry testified that at the pretrial stage of a criminal proceeding, it is important to release individuals from as jail early as possible because pretrial release reduces the demands on the county's jail and returns people to their families as soon as possible.  (Doc. 143, p. 168).  The sheriff generally releases defendants who can afford a secured bond within two hours of booking.   The sheriff must detain defendants who cannot afford a secured bond but are otherwise eligible for release at least until those defendants have an initial appearance.  (Doc. 129-1, pp. 8-9, ¶¶ 14-15).  An unsecured bond system would allow wealthy and indigent defendants to be released at the same rate and on the same basis, thereby *increasing* the efficiency of pretrial release in the county by freeing additional jail space and

returning all defendants, not just the wealthy, to their families as quickly as possible.  Cullman County has not examined or tested an unsecured bond system. (Doc. 136, p. 210).

With respect to the issue of pretrial appearance, the plaintiffs' evidence demonstrates that Cullman County likely would not see an increase in failures to appear with unsecured bonds.  Mr. Hester offered expert testimony and empirical studies to demonstrate that secured money bail is not more effective than unsecured bail or non-monetary conditions of release in reducing the risk of flight from prosecution.  For example, Dr. Demuth testified that "several recent empirical studies that compare the effectiveness of different kinds of bonds in assuring appearance in court . . . [found] no difference in the effectiveness of secured and unsecured bonds."  (Doc. 129-1, p. 5, ¶ 11).[18]  One of those studies concluded that regardless of a criminal defendant's pretrial risk category, "unsecured bonds offer decision-makers the same likelihood of court appearance as do secured bonds."

---

[18] Dr. Demuth testified that another study "provides mixed findings" and another "problematic study finds that secured bonds are more effective."  (Doc. 129-1, p. 5, ¶ 11).  According to Dr. Demuth, the "mixed findings" study did not consider unsecured money bail or non-financial release with restrictions and therefore does not provide a meaningful analysis of whether non-financial conditions or unsecured money bail are as effective as secured money bail.  (Doc. 129-1, p. 6).  According to Dr. Demuth, the "problematic study" analyzed "insufficient underlying data," used questionable and unreliable shortcuts to approximate data, and employed a statistical technique that did not overcome bias in the dataset.  Therefore, the problematic study fails "to inform our understanding of the relative effectiveness of secured and unsecured bonds."  (Doc. 129-1, pp. 6-7).

(Doc. 129-10, p. 13).[19]   Dr. Michael Jones, the study's author, considers this finding unsurprising "given that both bond types carry the potential for the defendant to lose money for failing to appear." (Doc. 129-10, p. 13). A study conducted by Claire M. B. Brooker, Dr. Jones, and Timothy R. Schnacke found that the average court appearance rate for criminal defendants in Jefferson County, Colorado did not differ significantly between judges who set more secured bonds and judges who set more unsecured bonds. (Doc. 129-11, p. 9).[20]

Mr. Hester's evidence shows that secured money bail actually may undermine the government's interest in court appearance because secured money bail results in longer periods of pretrial detention for those who cannot easily afford bail, which, in turn, is associated with higher failure to appear rates. (*See* Doc. 129-1, pp. 5, 11-12, ¶¶ 11, 18-19; Doc. 129-4, p. 5, ¶ 17). For example, a study conducted by Christopher T. Lowenkamp, Marie VanNostrand, and Alexander Holsinger found that criminal defendants who eventually are released after arrest are more likely to fail to appear for court the longer they are detained

---

[19] Dr. Jones analyzed the appearance rates of 1,309 criminal defendants in Colorado and assigned to each criminal defendant one of four categories of risk for failure to appear. (Doc. 129-10, p. 8).

[20] Ms. Booker, Dr. Jones, and Mr. Schnacke assigned 1,122 criminal defendants to one of two groups: those whose bonds were set by a judge who ordered many unsecured bonds and those whose bonds were set by judges who ordered many secured bonds. (Doc. 129-11, pp. 6-7). The researchers compared the pretrial appearance rates of both groups and found no meaningful statistical difference. (Doc. 129-11, p. 8).

pretrial.  (Doc. 129-12, pp. 11-12).[21]

And evidence suggests that most defendants released without financial incentives to appear in court still appear at a very high rate.  For example, Judge Morrison testified that in 2017, in Washington, D.C., where "financial conditions are almost never used" for pretrial release, 88% of criminal defendants released pretrial made all scheduled court appearances.  (Doc. 129-2, p. 5, ¶¶ 22, 25).  Dr. Jones stated that many research studies show that court date reminders, "which can be delivered through in-person meetings, letters, postcards, live callers, robocalls, text messages, and/or email," are the "single most effective pretrial risk management intervention for reducing failures to appear;" they improve court appearance by approximately 30% to 50%.  (Doc. 129-4, p. 14, ¶ 43).  Jacob Sills, the co-founder and CEO of a company that uses technology and behavioral research to help criminal defendants appear for court, testified that the failure to appear rate of public defender clients in Richmond, California decreased from 20% to under 4% after implementing text-message court date reminders.  (Doc. 129-7, p. 4, ¶ 11).  The failure to appear rate of low-income defendants in Luzerne County, Pennsylvania decreased from 15% to under 6% after implementing text-message court date reminders.  (Doc. 129-7, p. 4, ¶ 12).  Insha Rahman, a senior planner at a non-profit criminal justice organization that develops pretrial services,

---

[21] Dr. Lowenkamp, Dr. VanNostrand, and Dr. Holsinger analyzed data on 153,407 defendants booked into a jail in Kentucky during one year.  (Doc. 129-12, p. 7).

testified that in New York City, 95% of nearly 2,300 criminal defendants whose bail was paid by charitable organizations, i.e. who had no "skin in the game," made all court appearances. (Doc. 135-3, p. 4, ¶¶ 14-15).

The defendants have not offered empirical evidence or research studies to rebut Mr. Hester's considerable evidence. Judge Turner testified that he has no empirical evidence concerning or experience with unsecured bail to demonstrate that unsecured bail would increase failure to appear rates. (Doc. 143, pp. 116, 128-29). Instead, the defendants argue, without an evidentiary basis, that by requiring a criminal defendant or a third party to put "skin in the game," the criminal defendant is more likely to appear in court. (*See, e.g.,* Doc. 143, pp. 62, 69-70). Sheriff Gentry and Judge Turner testified that because family members or a commercial bondsman often pay a criminal defendant's bond, a secured money bail system encourages those third parties to hold a criminal defendant accountable for appearing in court. (Doc. 136, pp. 225-27; Doc. 143, pp. 367-68).

Other testimony from Sheriff Gentry and Judge Turner undermines the defendants' argument that secured money bail is necessary for court appearance. Sheriff Gentry acknowledged that a court-appointed third-party custodian would hold an individual just as accountable to appear in court as a family member who posted secured bond. (Doc. 136, p. 226). And Judge Turner acknowledged that an individual would have just as much "skin in the game" with an unsecured bond.

(Doc. 143, pp. 69-70).  Thus, the evidence demonstrates that secured bail is no more effective than other conditions to assure a criminal defendant's appearance at court proceedings, and secured bail is not necessary to secure a criminal defendant's appearance.

The defendants' third stated interest, the safety of the community, illustrates that Cullman County's bail procedure is entirely arbitrary.  Empirical studies demonstrate that there is no statistically significant difference between the rates at which criminal defendants released on secured and unsecured bail are charged with new crimes.  (Doc. 129-1, pp. 7-8, ¶¶ 12-13).  Dr. Jones's study found that regardless of a criminal defendant's pretrial risk, "unsecured bonds offer the same public safety benefit as do secured bonds."  (Doc. 129-10, p. 12).  Dr. Jones noted that his findings are consistent with at least two other research studies.  (Doc. 129-10, p. 12).  In addition, the study conducted by Ms. Brooker, Dr. Jones, and Mr. Schnacke found that "there was no significant difference in the overall public safety rate between" criminal defendants released by judges who set many secured bonds and criminal defendants released by judges who set many unsecured bonds.  (Doc. 129-11, p. 9).

Significantly, Mr. Hester offered expert testimony and research studies which demonstrate that prolonged pretrial detention is associated with a greater likelihood of re-arrest upon release, meaning that pretrial detention may *increase*

the risk of harm to the community.  (Doc. 129-1, pp. 7-8, ¶ 13).  Citing the study conducted by Dr. Lowenkamp, Dr. VanNostrand, and Dr. Holsinger, Dr. Jones testified that criminal defendants who are released in two to three days are 39% more likely, five to seven days 50% more likely, and 8 to 14 days 56% more likely to re-offend than those who are released within one day.  (Doc. 129-4, p. 5, ¶ 16; *see* Doc. 129-12, pp. 11-12, 20).  In addition, reviews of pretrial release practices in Washington, D.C., New Jersey, and Kentucky show that defendants released on unsecured bond or non-financial conditions are not more likely to re-offend than defendants released on secured bond.  (Doc. 129-2, p. 5, ¶ 25; Doc. 129-16, p. 5; Doc. 129-18, p. 18).

The defendants did not offer evidence to show that criminal defendants who cannot afford to pay secured money bond are more dangerous to the public than criminal defendants who can.  Judge Turner testified that he was not aware of empirical data showing that secured money bail ensures public safety more than other forms of pretrial release.  (Doc. 143, p. 131).  Sheriff Gentry testified that the threat of losing money creates the incentive to not commit new crimes after release.  (Doc. 143, p. 168).  But release on unsecured bond provides the same incentive because a judge may require a criminal defendant who commits a new crime while on pretrial release to pay the face value of the bond.

As currently implemented, Cullman County's bail schedule does nothing to

secure public safety.   A defendant with financial means who is charged with assault can go home within two hours of his arrest if he can post a $10,000 bond, while an indigent defendant charged with fourth degree possession of a forged instrument who cannot afford to post a $3,000 secured bond remains in custody awaiting a hearing.  (Doc. 122-1, p. 16).  More importantly, dangerous defendants charged with identical crimes are treated differently based on their financial status. The Sheriff's Office releases a dangerous defendant with financial means within two hours of arrest, but the Sheriff's Office detains an indigent defendant who must await an opportunity to convince a judge, who is not required to apply a particular evidentiary standard, that his or her past criminal history and/or current alleged conduct do not warrant an unattainable bond amount that will serve for that defendant as a *de facto* detention order.  The system is discriminatory:  not all criminal defendants who pose a real and present danger to the public are indigent, but Cullman County detains only indigent criminal defendants who pose a real and present danger to the public.  Dangerous defendants with means enjoy pretrial liberty.

In February 2018, Cullman County had 220 new arrests.  Of the 220 individuals arrested, 47 individuals had to await initial appearances, and 167 individuals were able to secure their release immediately.  (Doc. 143, pp. 192, 212).  None of those 167 individuals had to prove that they were not a danger to

the community or a flight risk.  With respect to those 167 individuals, Cullman County did nothing to determine whether conditions other than bond were necessary to protect the public or to ensure the defendant's appearance at court proceedings.  Cullman County professes concern for the safety of the citizens in the community, but the record demonstrates that that concern is illusory or at least half-hearted in implementation.  As Judge Turner stated, if Cullman County were to assess all arrestees for danger to the community, there would be many more individuals held pretrial in the Cullman County jail, just as there would be many additional detentions if Cullman County assessed all arrestees for flight risks.[22]

The defendants mention that they are open to making additional changes to their pretrial bail system, but they contend that "it's got to come from a state level. Whatever works for Cullman has got to be the same thing that works for Jefferson County, for Mobile County, for Escambia County."  (Doc. 143, p. 69).  The proposition is not persuasive.  Cullman County did not have to wait for the rest of the State of Alabama when it revised its pretrial bail procedures two weeks after Mr. Hester filed his motion for preliminary injunction.  And this Court does not

---

[22] If the record suggested that Cullman County had a robust practice of using bail requests forms pursuant to which law enforcement officers would ask judges to increase the amount of bail for defendants who the officers believe may be a threat to the community, the record might better support Cullman County's professed concern for the safety of the community.  The record contains no such suggestion.  Judge Turner explained that the bail request forms were part of Cullman County's pretrial system before the county's chief judge signed the March 2018 Standing Order, and Judge Turner testified that he has never seen a bail request form for a warrantless arrest. (Doc. 136, p. 275; Doc. 143, p. 143).  The defendants offered no evidence to establish how often law enforcement officers submit bail request forms for warrant arrests.

have a record before it that would allow it to determine whether the bail systems in other counties in Alabama suffer from constitutional flaws, such that state-wide reform is necessary. For purposes of this litigation, the Court is concerned only with the record concerning Cullman County.

None of the interests that the defendants have identified relating to Cullman's County's secured bail procedures finds support in the current record. Therefore, Mr. Hester has shown a substantial likelihood of success on the merits of his claim that Cullman County's bail procedures violate his right under the Fourteenth Amendment to equal treatment under the law.[23]

> b. *Substantive and Procedural Due Process - Individualized Release Hearing*

There is a substantial likelihood that Mr. Hester will prove that Cullman County's bail procedures violate his constitutional right to substantive and

---

[23] In her dissenting opinion in *Walker*, Judge Martin explained that she would apply heightened scrutiny to assess the constitutionality of a bail system that discriminates on the basis of wealth. 2018 WL 4000252 at * 24 (Martin, J. dissenting). Because pretrial liberty is a fundamental right to which heightened scrutiny applies, were this Court writing on a clean slate, it would apply heightened scrutiny to assess Cullman County's bail system under the equal protection/due process rubric for wealth-based classifications. *United States v. Salerno*, 481 U.S. 739, 749-50 (1987)(because the "interest in liberty" is "fundamental," it is a "'general rule' of substantive due process that the government may not detain a person prior to a judgment of guilt in a criminal trial."); *Reno v. Flores*, 507 U.S. 292, 302 (1993) (substantive due process "forbids the government to infringe certain 'fundamental' liberty interests at all, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest") (citing *Salerno*, 481 U.S. at 746); *Foucha v. Louisiana*, 504 U.S. 71, 81 (1992) (describing the narrowly tailored and least restrictive conditions on pretrial liberty imposed by the Bail Reform Act as analyzed in *Salerno*). Because Cullman County's bail system does not survive rational basis analysis, it necessarily would not survive heightened scrutiny.

procedural due process.   The substantive right to pretrial liberty may not be infringed without "constitutionally adequate procedures."  *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541 (1985).  "[D]ue process is flexible and calls for such procedural protections as the particular situation demands."  *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972).  A state's rule of criminal procedure violates the Due Process Clause when "it offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental."  *Medina v. California*, 505 U.S. 437, 445 (1992) (citations and internal quotation marks omitted); s*ee Nelson v. Colorado*, 581 U.S. ---, 137 S. Ct. 1249, 1255 (2017) ("*Medina* provides the appropriate framework for assessing the validity of state procedural rules that are part of the criminal process.") (internal quotation marks and alteration omitted).

Mr. Hester's substantive and procedural due process claims are related.  (Doc. 108, p. 19).   Mr. Hester contends that the defendants do not employ constitutionally adequate procedures at the initial appearance to protect putative class members' substantive right to pretrial liberty in violation of substantive and procedural due process.  (Doc. 95, p. 19, ¶ 84; Doc. 108, p. 19).  Specifically, Mr. Hester argues that the defendants, in violation of the Due Process Clause, do not provide clear notice to criminal defendants about the purpose of an initial appearance; give criminal defendants a full opportunity to speak and present

evidence; require express findings and a statement of reasons for detention; or follow an evidentiary standard for detention.  (Doc. 108, pp. 22-26; Doc. 131, pp. 17-23).[24]

Cullman County's secured money bail procedures are strikingly similar to the bail procedures at issue in the Fifth Circuit's recent opinion in *ODonnell v. Harris Cty.*, 892 F.3d 147 (5th Cir. 2018).  As explained by the district court in that case, following a citizen's arrest for a misdemeanor offense in Harris County, Texas, the district attorney would set a secured money bail amount according to a bail schedule.  *ODonnell v. Harris Cty., Texas*, 251 F. Supp. 3d 1052, 1088 (S.D. Tex. 2017), *aff'd as modified*, 882 F.3d 528 (5th Cir. 2018), *and aff'd as modified sub nom. ODonnell v. Harris Cty.*, 892 F.3d 147 (5th Cir. 2018).[25]  Like the Cullman County bail schedule, the Harris County bail schedule listed bail amounts for each potential offense.  *Id.*  The county released criminal defendants who paid the bond amount.  *Id.*  The county detained criminal defendants who could not pay the bond amount.  *Id.*

---

[24] In his complaint, Mr. Hester contends also that the defendants do not "restrict detention to extremely serious offenses."  (Doc. 95, p. 19, ¶ 85).  Mr. Hester has not raised this allegation in his motion for preliminary injunction.  In his motion for preliminary injunction, Mr. Hester has argued that due process requires defendants to have the assistance of counsel at an initial appearance under Cullman County's criminal pretrial procedures.  (Doc. 108, pp. 25-26).  Recently, Mr. Hester has asked for the opportunity to present additional briefing on this issue.  (Doc. 156).  Because the Court finds that Mr. Hester is entitled to a preliminary injunction for other reasons, the Court will delay its consideration of Mr. Hester's right to counsel argument.

[25] The Fifth Circuit affirmed the district court's factual findings.  *ODonnell*, 892 F.3d at 166.

According to the "Harris County Criminal Courts at Law Rules of Court," akin to the Standing Order in this case, criminal defendants who could not pay the bond amount were supposed to receive a probable cause hearing before a hearing officer within 24 hours of arrest. *ODonnell*, 251 F. Supp. 3d at 1086-87. A hearing officer was supposed to determine a criminal defendant's bail at the probable cause hearing. *Id.* at 1092. Like the judges in Cullman County, hearing officers at the probable cause hearing had the discretion to release criminal defendants on personal or unsecured bonds, to impose additional conditions of release, or to raise or lower the secured bond amount listed in the bail schedule. *Id.* According to Texas state law, hearing officers had to conduct an individualized review when setting bail using enumerated factors, including the defendant's ability to make bail. *Id.* at 1086.

Harris County's actual practices deviated considerably from these rules. The Fifth Circuit stated:

> Despite these formal requirements, the district court found that, in practice, County procedures were dictated by an unwritten custom and practice that was marred by gross inefficiencies, did not achieve any individualized assessment in setting bail, and was incompetent to do so. The district court noted that the statutorily-mandated probable cause hearing (where bail is usually set) frequently does not occur within 24 hours of arrest. The hearings often last seconds, and rarely more than a few minutes. Arrestees are instructed not to speak, and are not offered any opportunity to submit evidence of relative ability to post bond at the scheduled amount.

43

> The [district] court found that the results of this flawed procedural framework demonstrate the lack of individualized assessments when officials set bail. County officials "impose the scheduled bail amounts on a secured basis about 90 percent of the time. When [they] do change the bail amount, it is often to conform the amount to what is in the bail schedule." The court further found that, when Pretrial Services recommends release on personal bond, Hearing Officers reject the suggestion 66% of the time. Because less than 10% of misdemeanor arrestees are assigned an unsecured personal bond, some amount of upfront payment is required for release in the vast majority of cases.

*ODonnell*, 892 F.3d at 153-54. Moreover, criminal defendants almost never had counsel at the probable cause hearings, and the county did not provide counsel to indigent defendants. *ODonnell*, 251 F. Supp. 3d at 1093. Hearing officers did not make written findings or explain why they set the bail in the type and amount imposed. *Id.* Hearing officers occasionally made abbreviated notes on forms such as "criminal history," "safety of community," or "safety" to indicate the rationale for pretrial bail, but the forms did not otherwise indicate that the hearing officers weighed relevant factors in setting bail. *Id.*

Like Cullman County, Harris County argued that its bail system was necessary to ensure a criminal defendant's appearance at court and to protect the community. The district court rejected Harris County's argument, and the Fifth Circuit affirmed the district court's decision. *ODonnell*, 892 F.3d at 154, 166. The Fifth Circuit explained:

> [t]he [district] court rejected the argument that imposing secured bonds served the County's interest in ensuring the arrestee appeared at

the future court date and committed no further crime.  The court's review of reams of empirical data suggested the opposite: that "release on secured financial conditions does not assure better rates of appearance or of law-abiding conduct before trial compared to release on unsecured bonds or nonfinancial conditions of supervision." Instead, the County's true purpose was "to achieve pretrial detention of misdemeanor defendants who are too poor to pay, when those defendants would promptly be released if they could pay."  In short, "secured money bail function[ed] as a pretrial detention order" against the indigent misdemeanor arrestees.

*ODonnell*, 892 F.3d at 154.

The Fifth Circuit affirmed the district court's ruling that Harris County violated indigent criminal defendants' due process rights by infringing on the fundamental right to pretrial liberty without constitutionally adequate procedures. *ODonnell*, 892 F.3d at 159.  The Fifth Circuit stated:

As the district court found, the current procedures are inadequate—even when applied to our narrower understanding of the liberty interest at stake.  The court's factual findings (which are not clearly erroneous) demonstrate that secured bail orders are imposed almost automatically on indigent arrestees.  Far from demonstrating sensitivity to the indigent misdemeanor defendants' ability to pay, Hearing Officers and County Judges almost always set a bail amount that detains the indigent.  In other words, the current procedure does not sufficiently protect detainees from magistrates imposing bail as an "instrument of oppression."

*ODonnell*, 892 F.3d at 159.

The Fifth Circuit found that the "fundamental source of constitutional deficiency in the due process and equal protection analyses is the same: [Harris] County's mechanical application of the secured bail schedule without regard for

45

the individual arrestee's personal circumstances." *ODonnell*, 892 F.3d at 163.  To cure the due process and equal protection violations, the county had to "implement the constitutionally-necessary procedures to engage in a case-by-case evaluation of a given arrestee's circumstances, taking into account the various factors required by Texas state law (only one of which is ability to pay)." *Id.*  The Fifth Circuit held that "constitutionally-necessary procedures" specifically included "notice, an opportunity to be heard and submit evidence within 48 hours of arrest, and a reasoned decision by an impartial decisionmaker." *Id.*

Although the Fifth Circuit affirmed the district court's conclusion that Harris County's bail procedures violated the Due Process Clause, the Fifth Circuit found that the district court's preliminary injunction was overly broad.  *ODonnell*, 892 F.3d at 166.  The Fifth Circuit held that hearing officers did not have "to issue a written statement of their reasons." *Id.* at 160.  The Fifth Circuit "decline[d] to hold that the Constitution requires the County to produce 50,000 written opinions per year to satisfy due process." *Id.*  Instead, because "the constitutional defect in the process afforded was the *automatic* imposition of pretrial detention on indigent misdemeanor arrestees, requiring [hearing officers] to specifically enunciate their individualized, case-specific reasons for so doing is a sufficient remedy." *Id.* (emphasis in original).  And the Fifth Circuit "conclude[d] that the federal due process right entitles detainees to a hearing within 48 hours" as opposed to the 24

hour window that the district court required in its injunction.  *Id.*

The Fifth Circuit provided the district court with a draft injunction that "represent[ed] the sort of modification that would be appropriate" and left the details to the district court's discretion.  *ODonnell*, 892 F.3d at 164.  Provisions in the draft injunction most relevant to this case are:

- Harris County is enjoined from imposing prescheduled bail amounts as a condition of release on arrestees who attest that they cannot afford such amounts without providing an adequate process for ensuring that there is individual consideration for each arrestee of whether another amount or condition provides sufficient sureties.

- Pretrial Services officers, as County employees and subject to its policies, must verify an arrestee's ability to pay a prescheduled financial condition of release by an affidavit, and must explain to arrestees the nature and significance of the verification process.

- The purpose of the explanation is to provide the notice due process requires that a misdemeanor defendant's state constitutional right to be bailable by sufficient sureties is at stake in the proceedings. . .

- The affidavit must give the misdemeanor arrestee sufficient opportunity to declare under penalty of perjury, after the significance of the information has been explained, the maximum amount of financial security the arrestee would be able to post or pay up front within 24 hours of arrest.  The affidavit should ask the arrestee to provide details about their financial situation . . . .  The question is neither the arrestee's immediate ability to pay with cash on hand, nor what assets the arrestee could eventually produce after a period of pretrial detention.  The question is what amount the arrestee could reasonably pay within 24 hours of his or her arrest, from any source, including the contributions of family and friends.

. . .

- Misdemeanor defendants who are [eligible to secure their release by paying secured bond are] entitled to a hearing within 48 hours of arrest in which an impartial decision-maker conducts an individual assessment of whether another amount of bail or other condition provides sufficient sureties.  At the hearing, the arrestee must have an opportunity to describe evidence in his or her favor, and to respond to evidence described or presented by law enforcement.  If the decision-maker declines to lower bail from the prescheduled amount to an amount the arrestee is able to pay, then the decisionmaker must provide written factual findings or factual findings on the record explaining the reason for the decision, and the County must provide the arrestee with a formal adversarial bail review hearing before a County Judge.  The Harris County Sheriff is therefore authorized to decline to enforce orders requiring payment of prescheduled bail amounts as a condition of release for said defendants if the orders are not accompanied by a record showing that the required individual assessment was made and an opportunity for formal review was provided. . . .

*ODonnell*, 892 F.3d at 164-66.

There is no meaningful difference between the bail procedures in this case and the procedures in *ODonnell*; both are equally arbitrary.  Like Harris County pre-*ODonnell*, Cullman County mechanically applies a secured money bail schedule to detain the poor and release the wealthy.  Like Harris County, Cullman County argues that its written "individualized" release procedures protect indigent defendants' due process rights.  And like Harris County, Cullman County's actual procedures are significantly less individualized and protective than due process

requires.[26]

The following procedural deficiencies in Cullman County's bail procedures create a substantial likelihood of success for the plaintiffs on their due process claim.

- **Absence of adequate notice**

The defendants do not provide constitutionally adequate notice to indigent criminal defendants before an initial appearance. "[N]otice is essential to afford the prisoner an opportunity to challenge the contemplated action and to understand

---

[26] Recent developments in other jurisdictions support Mr. Hester's due process claim. Notably, the U.S. District Court for the Eastern District of Louisiana recently found that each of the procedural deficiencies alleged by Mr. Hester violates due process at an initial appearance where a defendant is at risk of a *de facto* detention order because of her indigency. *Caliste v. Cantrell*, --- F. Supp. 3d ---, 2018 WL 3727768, at *12 (E.D. La. Aug. 6, 2018). In addition, the governor of California recently signed into law the California Money Bail Reform Act, 2018 Cal. Legis. Serv. Ch. 244 (S.B. 10) (effective date October 1, 2019). The Act appears to eliminate money bail and provide all of the procedural safeguards that Mr. Hester argues the Due Process Clause demands Cullman County to provide at an initial appearance.

Generally, pursuant to the California Money Bail Reform Act, pretrial risk assessment services determine whether an individual booked on a charge other than a misdemeanor is "low risk," "medium risk," or "high risk" of failure to appear or danger to the public. S.B. 10, §§ 1320.7(a)-(c), 1320.9. Pretrial risk assessment services release low risk defendants on their own recognizance without a hearing. S.B. 10, § 1320.10(b). Pretrial risk assessment services may release medium risk defendants on their own recognizance without a hearing or recommend an arraignment hearing. S.B. 10, § 1320.10(c). The court conducts an arraignment hearing for any detained defendant. S.B. 10, § 1320.15. "At arraignment, the court shall order a defendant released on his or her own recognizance or supervised own recognizance with the least restrictive nonmonetary condition . . . that will reasonably assure public safety and the defendant's return to court unless the prosecution files a motion for preventive detention." S.B. 10, § 1320.17. The court must conduct a hearing on the motion for preventive detention at which the defendant has the right to court-appointed counsel. S.B. 10, § 1320.19(d). The defendant must have the opportunity to be heard and present evidence. S.B. 10, § 1320.20(c). The court may order detention only if the court determines by clear and convincing evidence that no nonmonetary condition of release will reasonably assure public safety and court appearance and must state its reasons on the record. S.B. 10, § 1320.20(d)(1). Otherwise, the court must release the defendant on her own or supervised recognizance. S.B. 10, § 1320.20(e)(1).

the nature of what is happening to him." *Vitek v. Jones*, 445 U.S. 480, 496 (1980) (citing *Wolff v. McDonnell*, 418 U.S. 539, 564 (1974)). The notice must be tailored, "in light of the decision to be made, to 'the capacities and circumstances of those who are to be heard,' to insure that they are given a meaningful opportunity to present their case." *Mathews v. Eldridge*, 424 U.S. 319, 349 (1976) (quoting *Goldberg v. Kelly*, 397 U.S. 254, 268-69 (1970)).

Here, there is no evidence in the record that the defendants inform arrestees of what is at stake at an initial appearance or that the sheriff's court liaison officers explain the initial hearing process to detainees. Those officers offer detainees a release questionnaire, which detainees may refuse. The notice statement in the release questionnaire, "FOR THE PURPOSE OF DETERMINING CONDITIONS OF PRE-TRIAL RELEASE IN THIS CASE, THE COURT MAY TAKE INTO ACCOUNT THE FOLLOWING," is vague and substantively inadequate. (Doc. 129-41, p. 2). The release questionnaire does not communicate the most crucial piece of information, namely, that a judge may enter a *de facto* detention order by setting unaffordable secured money bail even after considering the information provided by the defendant. *See Caliste v. Cantrell*, --- F. Supp. 3d ---, 2018 WL 3727768, at *11 (E.D. La. Aug. 6, 2018) (granting summary judgment for plaintiff in part because secured money bail procedures did not "provide[] notice of the importance of the issue of the criminal defendant's ability to pay").

50

The language in the release questionnaire suggests to a defendant that she is entitled to some form of "release," when she really is not because the court may exercise its discretion to enter what amounts to an order of detention.   Judge Turner acknowledged that at an initial appearance, a stage at which indigent defendants do not have counsel, he does not inform criminal defendants of the fourteen factors he considers when setting secured bail, so a defendant cannot know what information may be important to share for an assessment of conditions of release.   (Doc. 143, p. 91).   Judge Turner stated that he asks few questions during an initial appearance, most of the defendants who appear before him lack formal education, and many defendants are illiterate or have learning disabilities. (Doc. 136, p. 289).   Having these defendants rely on the information in the release questionnaire for notice is tantamount to no notice at all.   These defendants do not receive adequate notice of their constitutional right to pretrial liberty or the evidence they must provide to prove that there are non-monetary conditions of pretrial release that will satisfy the purposes of bail.   (Doc. 143, pp. 92-93).

- **Absence of an opportunity to be heard**

Under the March 2018 Standing Order, at an initial appearance, a Cullman County judge does not have to give a criminal defendant an opportunity to be heard or present evidence.   According to the Standing Order, the judge "may" give the defendant an opportunity to speak.   (Doc. 129-36, p. 7)   ("The Court . . . *may*

elicit testimony about the defendant's financial condition.") (emphasis added).
Judge Turner testified that he asks the defendant some questions at the initial
appearance, but he "tr[ies] not to ask too many questions." (Doc. 136, pp. 288-89).
The record does not indicate whether other judges in Cullman County elicit
information from defendants during an initial appearance. Although a check-box
on the Order on Initial Appearance and Bond Hearing states, "Bail: Gave the
Defendant the opportunity to make a statement regarding his/her ability to post the
bond currently set in this matter," there is no evidence that a judge must check this
box or that judges give criminal defendants a meaningful opportunity to speak.
(Doc. 129-40, p. 2). Under the Standing Order, a judge does not have to provide
the defendant an opportunity to present evidence. Accordingly, the defendants
impermissibly leave a criminal defendant's opportunity to be heard, a
"fundamental requirement of due process," up to the judge's discretion. *Mathews*,
424 U.S. at 333.; *see Caliste*, 2018 WL 3727768, at *9-10 (finding an opportunity
to be heard to be an essential requirement of due process at a hearing where a
defendant faces pretrial detention because of indigency) (citing *Turner v. Rogers*,
564 U.S. 431, 445 (2011), *Bearden v. Georgia*, 461 U.S. 660, 672 (1983), and
*Cain v. City of New Orleans*, 281 F. Supp. 3d 624, 652 (E.D. La. 2017)).

- **Absence of an evidentiary standard**

Under the March 2018 Standing Order, neither the Cullman County Sheriff

nor a Cullman County judge must satisfy an evidentiary standard before entering an unaffordable secured bond that serves as a *de facto* detention order. "The function of a standard of proof, as that concept is embodied in the Due Process Clause and in the realm of factfinding, is to instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication." *Addington v. Texas*, 441 U.S. 418, 423 (1979) (internal quotation marks and citation omitted). The Supreme Court has consistently "mandated an intermediate standard of proof—'clear and convincing evidence'—when the individual interests at stake in a state proceeding are both 'particularly important' and 'more substantial than mere loss of money.'" *Santosky v. Kramer*, 455 U.S. 745, 756 (1982) (quoting *Addington*, 441 U.S. at 424 (1979)). The Supreme Court "has deemed this level of certainty necessary to preserve fundamental fairness in a variety of government-initiated proceedings that threaten the individual involved with 'a significant deprivation of liberty' or 'stigma.'" *Santosky*, 455 U.S. at 756 (quoting *Addington*, 441 U.S. at 425-26). Pursuant to these concerns, the Supreme Court has established a clear and convincing evidence standard for civil commitment for mental illness, *Addington*, 441 U.S. at 433, deportation of a resident alien, *Woodby v. Immigration & Naturalization Serv.*, 385 U.S. 276, 286 (1966), denaturalization, *Chaunt v. United States*, 364 U.S. 350, 353-55 (1960), and parental rights termination proceedings,

*Santosky*, 455 U.S. at 768-69.   *See Caliste*, 2018 WL 3727768, at *10 ("[T]he Court agrees . . . 'the government must prove the facts supporting a finding of flight risk by clear and convincing evidence.'") (quoting *United States v. Motamedi*, 767 F.2d 1403, 1409 (9th Cir. 1985) (Boochever, J., concurring in part and dissenting in part)).

The level of certainty that the clear and convincing evidence standard provides is necessary to ensure fundamental fairness in bail proceedings. The detention of a criminal defendant in Cullman County without a specific degree of confidence that detention is necessary offends a fundamental principle of justice. At an initial appearance, an indigent defendant faces a substantial "loss of personal liberty through imprisonment," a penalty which "lies at the core of the liberty protected by the Due Process Clause." *Turner*, 564 U.S. at 445. Accordingly, before ordering an unaffordable secured bond, a judge must find by clear and convincing evidence that pretrial detention is necessary to secure the defendant's appearance at trial or to protect the public.

- **Absence of factual findings**

Although the Standing Order states that "[t]he Court will make a written finding as to why the posting of a bond is reasonably necessary . . ." (Doc. 129-36, p. 7), Cullman County judges do not actually make "findings." Instead, a judge merely checks a box for any of fourteen factors he "considered." (Doc. 129-36,

pp. 6-7; Doc. 129-40, p. 3).  This is insufficient.

Checking boxes for factors "considered" is just as inadequate as jotting abbreviated factors such as "safety" or "criminal history," per the hearing officers in *ODonnell*.  Cullman County's check-boxes simply restate the factors in Rule 7.2(a) of the Alabama Rules of Criminal Procedure.  As a matter of state law, every judge presumably considers these factors when setting a bond amount or imposing other conditions for pretrial release.  Aside from the "Other" check-box and the corresponding two blank lines, which a judge does not have to use, no check-box provides individualized information or suggests that the judge actually made a finding with respect to a particular factor.  For example, when a judge sets secured bail and checks "[t]he age, background and family ties, relationships and circumstances of the defendant" or "the defendant's reputation, character, and health," the check communicates no individualized reason for the judge's decision, and a checked box does not indicate whether a factor worked in the defendant's favor or worked against her.

To obtain her freedom after an initial appearance, an indigent defendant must move the state court to reduce her bond.  At this stage of Cullman County's bail proceedings, an indigent defendant finally obtains the assistance of appointed counsel, but the record affords appointed counsel no information regarding the rationale for her client's bond, making the task of identifying error and challenging

the bail amount unreasonably -- and potentially insurmountably -- difficult. Checking boxes for factors "considered" is tantamount to providing counsel with a copy of Rule 7.2(a) of the Alabama Rules of Criminal Procedure; checkboxes for factors "considered" provide no meaningful information to indigent defendants or their appointed counsel.

To cure these deficiencies, at a minimum, a judge must state on the record why the court determined that setting secured money bond above a defendant's financial means was necessary to secure the defendant's appearance at trial or protect the community. *See Goldberg*, 397 U.S. at  271 (due process generally requires the decision maker to "state the reasons for his determination and indicate the evidence he relied on, though his statement need not amount to a full opinion or even formal findings of fact and conclusions of law"); *Holley v. Seminole Cty. Sch. Dist.*, 755 F.2d 1492, 1499 (11th Cir. 1985) ("It serves as a bulwark to our procedural due process review, in that a decision without basis in fact would tend to indicate that the procedures, no matter how scrupulously followed, had been a mockery of their intended purpose—rational decisionmaking."); *Caliste*, 2018 WL 3727768, at *9 (finding that *Salerno*, *Bearden*, and *Turner* demonstrate "the Supreme Court's emphasis on the due process requirements of an informed inquiry into the ability to pay and findings on the record regarding that ability prior to detention based on failure to pay").

In all of these areas -- absence of notice, absence of an opportunity to be heard, absence of an evidentiary standard, and absence of factual findings -- Mr. Hester has demonstrated a substantial likelihood of success in proving that the defendants violate due process.

The *Walker* opinion does not affect the due process analysis in this case. As discussed above, Cullman County's bail procedures differ significantly from those of the City of Calhoun. Calhoun's Standing Bail Order provided, "'those individuals who do not obtain release pursuant to the secured bail schedule . . . shall . . . be brought before the [Municipal] Court' within 48 hours from their arrest, shall 'be represented by court appointed counsel,' and 'will be given the opportunity to object to the bail amount . . . , including any claim of indigency.'" *Walker*, 2018 WL 4000252, at *1. Calhoun guaranteed counsel and the opportunity to be heard. The availability of counsel made the opportunity to be heard meaningful. Cullman County offers no such opportunity to indigent defendants at an initial appearance.

Notably, the Eleventh Circuit did not address notice, findings, or an evidentiary standard in *Walker*. Calhoun's Standing Bail Order may have provided those safeguards, but even if the Calhoun Standing Bail Order lacked certain safeguards, Calhoun's requirement of counsel at an initial bail hearing -- perhaps the most significant safeguard -- mitigates other constitutional concerns. For

example, if a judge did not give a defendant an opportunity to be heard, counsel could request such an opportunity.  If a judge did not inform a defendant of the importance of her ability to post bond, counsel could do so.  In contrast, the lack of counsel in Cullman County exacerbates each procedural defect in Cullman's bail system.  Lack of adequate notice, an opportunity to be heard, findings on the record, and an evidentiary standard raise significantly more concern when an indigent defendant must confront those obstacles by herself.  And at the end of the day, in Calhoun, a detainee simply had to prove that she was indigent to secure release within 48 hours.  *Walker*, 2018 WL 4000252, at *14 n.12 ("[T]he Standing Bail Order guarantees release to indigents within 48 hours.  It therefore accords entirely with *ODonnell*'s holding that what the Constitution requires is 'an opportunity to be heard and submit evidence within 48 hours of arrest, and a reasoned decision by an impartial decisionmaker.'  [*ODonnell*, 892 F.3d] at 163.").  Cullman County detainees must satisfy fourteen factors for release, all without the assistance of counsel.

Because the Eleventh Circuit in *Walker* "decide[d] what process the Constitution requires in setting bail for indigent arrestees," 2018 WL 4000252, at *1, the *Walker* opinion is undoubtedly relevant to this case, but based on the considerable differences between Calhoun's Standing Bail Order and Cullman County's procedures, *Walker* does not change the fact that Mr. Hester has

demonstrated a substantial likelihood of success on the merits of his due process claim.

2.      Irreparable Injury to the Putative Class

The Supreme Court has recognized that the "time spent in jail awaiting trial has a detrimental impact on the individual.  It often means loss of a job; it disrupts family life; and it enforces idleness." *Barker v. Wingo*, 407 U.S. 514, 532 (1972). Imprisonment hinders a defendant's ability to prepare her defense, forces her to live "under a cloud of anxiety, suspicion, and often hostility," and is "simply dead time" that the defendant can never get back. *Id.* at 532-33.

The evidence in this case is consistent with the Supreme Court's observations in *Barker*.  Mr. Hester's evidence demonstrates that pretrial detention for three days or less negatively influences a person's employment, financial circumstances, housing, and the wellbeing of dependent family members.  (Doc. 129-1, pp. 9-11, ¶¶ 16-17; Doc. 129-4, pp. 6-7, ¶ 23).  These detrimental impacts are exacerbated when pretrial incarceration exceeds three days.  (*See* Doc. 129-1, pp. 9-11, ¶¶ 16-17; Doc. 136, pp. 64-65, 112-14).

Four studies in the record show that pretrial detention is associated with a higher rate of conviction because detention hampers a defendant's ability to prepare a defense and induces people to plead guilty to get out of jail.  A study from Harris County, Texas found that "defendants who are detained on a

misdemeanor charge are much more likely than similarly situated [defendants who are released pretrial] to plead guilty and serve jail time.  Compared to similarly situated [released defendants], detained defendants are 25% more likely to be convicted . . . ." (Doc. 129-19, p. 8).  A study from Pittsburgh found that "pretrial detention leads to a 13% increase in the likelihood of being convicted, an effect largely explained by an increase in guilty pleas among defendants who otherwise would have been acquitted or had their charges dropped." (Doc. 129-20, p. 2).  A study from Philadelphia and Pittsburg found that "criminal defendants who are assessed money bail are 12% [] more likely to be convicted." (Doc. 129-21, p. 4). And data from New York City shows that 92% of people detained pretrial pleaded guilty, while only 24% and 32% of the cases in which the defendant's bail was paid by the Bronx Freedom and Brooklyn Community Bail Fund, respectively, resulted in a criminal conviction. (Doc. 135-3, pp. 3-4, ¶¶ 11, 14-15).

Two studies in the record show that pretrial detention is associated with harsher sentences upon conviction.  The Harris County, Texas study found that detained individuals were 43% more likely than similarly situated released individuals to be sentenced to a term of incarceration. (Doc. 129-19, p. 8).  The Philadelphia study found that defendants detained pretrial generally end up owing $129 more in non-bail court fees and are sentenced to an additional 124 days on average upon conviction. (Doc. 129-20, p. 4).

In addition, detention for more than 24 hours before release appears to increase the risk of recidivism.  (Doc. 129-1, pp. 11-12, ¶¶ 18-19; Doc. 136, pp. 73-74).  The risk compounds as the length of detention increases.  (Doc. 129-1, p. 12, ¶ 19; Doc. 129-12, pp. 5, 12).  For example, the Philadelphia/Pittsburgh study found that secured money bail is "a significant, independent cause of . . . recidivism. . . . [T]he assessment of money bail increases recidivism in our sample period by 6-9% yearly []."  (Doc. 129-21, p. 4).  The study conducted by Dr. Lowenkamp, Dr. VanNostrand, and Dr. Holsinger found that "[b]eing detained pretrial for two days or more is related to the likelihood of post-disposition recidivism.  Generally, as the length of time in pretrial detention increases, so does the likelihood of recidivism at both the 12-month and 24-month points."  (Doc. 129-12, p. 5).  The study also found that "[t]he longer low-risk defendants are detained, the more likely they are to have new criminal activity pretrial (1.39 times more likely when held 2 to 3 days, increasing to 1.74 when held 31 days or more)."  (Doc. 129-12, p. 12).

Therefore, individuals who, by law, are presumed innocent suffer irreparable injury when they are detained because they cannot afford to pay secured bond and are deprived of constitutionally adequate procedures for examining potential non-monetary conditions of release.

3.   <u>Injury to the Defendants</u>

The threatened harms to the putative class outweigh the harms the preliminary injunction may cause to the defendants.  The defendants argue that no alternative systems are workable in Cullman County.  The defendants contend that detaining every arrestee until an initial appearance would put considerable strain on the county's resources.  (Doc. 136, pp. 230-31; Doc. 143, pp. 66-68).[27]  Judge Turner stated that the circuit court's resources already are taxed to handle the 72-hour initial appearances, the county has no government-funded pretrial services staff, and the county needs one more judge just to keep up with the circuit court's current case load.  (Doc. 143, pp. 51-53).  According to Sheriff Gentry, funding for the sheriff's department has not increased since 2009.  (Doc. 136, p. 254).

But alternative pretrial detention policies are cost effective.  Three options are readily available to Cullman County at little or no cost.  First, Cullman County could release all defendants on unsecured bond.  In a case in which a defendant may pose a significant flight risk or a danger to the community, a judge could hold an initial hearing within 48 hours of arrest and, if necessary based on the evidence collected at the hearing, impose additional conditions for release such as a court-

---

[27] Mr. Hester has not urged the defendants to detain every arrestee until an initial appearance. Cullman County has offered no reason why it could not, at a minimum, use unsecured bond for non-violent arrestees.  As noted, individuals released on unsecured bond would have "skin in the game," and unsecured bond would enable Sheriff Gentry to release all non-violent arrestees, not just wealthy arrestees, more quickly.

appointed third-party custodian or a requirement that the defendant periodically call one of the sheriff's court liaisons. The defendants acknowledge that an unsecured bail schedule would serve their interests. (Doc. 136, p. 211; Doc. 143, pp. 69-70, 133-34).

Alternatively, Cullman County could adopt the Calhoun model and, within 48 hours of arrest, release on recognizance bonds all indigent defendants who prove their indigency on the basis of an objective standard.

Finally, Cullman County could have all arrestees complete a release questionnaire, updated to conform to the procedural requirements discussed above. The Sheriff's Office could review those questionnaires and release on unsecured bond all low-risk arrestees. The Sheriff's Office would detain all high risk arrestees, wealthy and indigent alike, for an initial appearance at which a judge would assess the necessary conditions for pretrial release.

Holding procedurally sufficient initial appearances consistent with this memorandum opinion would not be overly burdensome. The defendants may be able to provide sufficient notice to arrestees by, for example, editing the affidavit of substantial hardship and release questionnaire and making sure that arrestees who have difficulty understanding the forms receive assistance. Satisfying an evidentiary standard before setting bail should add no extra cost, and making actual findings when requiring a bond may require very little extra time, if any.

### 4.    Public Interest

A preliminary injunction would prevent continuing deprivation of core constitutional rights by prohibiting detention based solely on predetermined secured money bail amounts without sufficient substantive findings and adequate procedural protections.  It would not impair the efficacy of the justice system or endanger the public.  Therefore, a preliminary injunction would not disserve the public interest.

### 5.    Security

Because Mr. Hester and members of the putative class are, by definition, indigent, the Court exercises its discretion to waive the security required by Rule 65(c) of the Federal Rules of Civil Procedure.  *See Sanders v. Sellers-Earnest*, 768 F. Supp. 2d 1180, 1188 (M.D. Fla. 2010).

## III.    CONCLUSION

For the reasons stated above, Mr. Hester has demonstrated that he is entitled to a preliminary injunction consistent with the analysis in this opinion.  The Court will set a telephone conference to discuss the terms of a preliminary injunction.

**DONE** and **ORDERED** this September 4, 2018.

_____
**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE